## COMMONWEALTH vs. SHAWN SHEA.

Hampden. February 11, 2011. - July 19, 2011.

Present: SPINA, CORDY, BOTSFORD, GANTS, & DUFFLY, JJ.

*Homicide. Jury and Jurors. Constitutional Law,* Jury. *Practice, Criminal,* Jury and jurors, Admissions and confessions, Instructions to jury, Verdict, Capital case, Required finding, Notetaking by jurors. *Evidence,* Admission by silence, Impeachment of credibility. *Intent.*

At a murder trial, the judge's unorthodox jury selection procedure (in which the judge asked the venire collectively questions of racial bias, instructing them to make "mental notes" rather than raise their hands in response to any affirmative answer to the questions) did not constitute an abuse of discretion or deny the defendant his right to an impartial jury, where all the prospective jurors were brought individually to sidebar and asked whether they had answered any question in the affirmative. [167-170]

At a murder trial, there was no error in the admission of testimony by a witness regarding the defendant's silence, after she accused him of the killing, as an adoptive admission of the truth of the accusation, where the evidence was sufficient for the jury reasonably to find that the defendant heard the witness's statement and understood that she was accusing him of the recent killing of the fourteen year old victim, that he had the opportunity to deny it, and that a reasonable person in those circumstances who did not participate in the killing would have denied it. [170-171]

At a criminal trial, the judge abused his discretion by excluding testimony regarding a material prior inconsistent statement of a prosecution witness, where, given that the statement was relevant to the credibility of the only witness who was in the automobile at the time of the shooting, it should have been admitted for the limited purpose of impeaching the credibility of the prosecution witness at trial [171-172]; however, no prejudice arose from the error, where the excluded statement would have added little to the jury's over-all evaluation of the credibility of the prosecution witness [172].

At a murder trial, no substantial likelihood of a miscarriage of justice arose from the judge's instruction to the jury on transferred intent, where, viewed as a whole, there was no significant risk that a reasonable jury would have understood the instruction to mean that the defendant could be found guilty of premeditated murder in the first degree based solely on the transferred intent to shoot someone, and where, considering the entirety of the judge's instructions regarding murder in the first degree, it could be said confidently that the judge's isolated error in describing what must be proven to establish murder in the first degree based on premeditation played no role in the jury's verdict. [172-174]

At a murder trial, the judge did not err in declining to ask the jury to clarify their verdict on the verdict slip, which indicated that they had found the defendant guilty of murder in the first degree but did not indicate the theory or theories on which they found the defendant guilty, where, given that the jury were instructed only on one theory and a general verdict of murder in the first degree was returned, the verdict slip was not ambiguous as to the theory of guilt found and did not raise any reasonable doubt whether the jury were unanimous in finding guilt on that theory. [174-176]

This court concluded that the evidence at the trial of indictments charging, inter alia, murder in the first degree was sufficient to sustain the defendant's conviction. [176]

Discussion of permissibility of juror notetaking. [176-179]

This court referred the question whether it should revise its rules to require that jurors be permitted to take notes during some or all trials, or whether it should continue to leave such decisions to the discretion of the judge, to this court's standing advisory committees on the rules of criminal and civil procedure. [179-180]

INDICTMENTS found and returned in the Superior Court Department on June 8, 2007.

The cases were tried before *Peter A. Velis*, J.

*Esther J. Horwich* for the defendant.

*Jane Davidson Montori*, Assistant District Attorney, for the Commonwealth.

GANTS, J. On May 10, 2007, at approximately 11:45 P.M., six shots were fired from a passing white Toyota Camry automobile at a group of people gathered on the front steps and porch of a Springfield house. One of those shots struck fourteen year old Dymond McGowan in the abdomen and caused her death. A jury in the Superior Court convicted the defendant of murder in the first degree on a theory of deliberate premeditation; the jury also convicted the defendant of the use of a firearm in the commission of a felony, and the unlawful possession of a firearm.[1] On appeal, the defendant argues that he should be granted a new trial because the trial judge erred (1) by asking the members of the jury venire to make "mental note[s]" rather than raise

---

[1]The defendant was sentenced to life without the possibility of parole on the murder conviction. He was also sentenced to from five years to five years and one day in State prison on the conviction of use of a firearm in the commission of a felony, and eighteen months in a house of correction on the conviction of unlawful possession of a firearm, each to be served concurrent with the sentence for murder.

their hands in response to any affirmative answer to the questions asked by the judge during jury selection; (2) by allowing a witness to testify to the defendant's silence after she accused him of the killing; (3) by preventing the defendant from admitting in evidence that the Commonwealth's key percipient witness had told another witness that he had not seen anything; (4) in instructing the jury regarding transferred intent; and (5) in refusing to ask the jury for clarification of their finding as to murder in the first degree, where they did not separately indicate that they based their verdict on a theory of deliberate premeditation, the only theory on which they were instructed. We conclude as to each of these grounds that the judge either did not err or that his error did not prejudice the defendant, and affirm the defendant's convictions. After a complete review of the record, we also conclude that there is no basis to exercise our power under G. L. c. 278, § 33E, to reduce his murder conviction to a lesser degree of guilt or to order a new trial.

*Background.* Because the defendant does not challenge the sufficiency of the evidence, we briefly summarize it, viewed in the light most favorable to the prosecution, reserving certain details for our analysis of the issues raised on appeal.

The defendant was associated with the "SWAT Team," which began as a group of friends who played music and basketball together in Springfield and later became allied with the Eastern Avenue gang. The SWAT Team was a rival of a number of other Springfield street gangs, including the Bristol Street gang, and the rivalry resulted in fights and shootings. The house targeted in the shooting on May 10, 2007, 338 Wilbraham Road in Springfield, was near the corner of Bristol Street and was a "hang-out spot" for the Bristol Street gang.

At approximately 9:30 P.M. on May 10, Donnell Godbolt, a SWAT Team member, borrowed his girl friend's white Toyota Camry automobile. Godbolt and the defendant drove to the home of Robert Morales, another SWAT Team member, and Godbolt asked Morales for a gun. Morales gave Godbolt a .40 caliber Glock semiautomatic pistol, and Godbolt left with the defendant.

Also that night, Godbolt picked up a friend, Robert Lee Arnold, Jr. Godbolt dropped Arnold at his grandmother's house

on Tyler Street in Springfield, where Arnold picked up two duffel bags of clothes. Godbolt later returned to drive Arnold to Western New England College, this time accompanied by Alexander Vaughn. When they left Tyler Street, Godbolt was driving; Vaughn was in the front passenger seat; Arnold sat in the rear seat behind the driver; and the defendant, who had been hanging out with others on Tyler Street, sat in the rear seat behind Vaughn; a child's car seat was in the back seat, between the defendant and Arnold. All occupants of the vehicle were either members of the SWAT Team or affiliated with the SWAT Team or the Eastern Avenue gang.

En route, rather than take a right turn toward Western New England College, Godbolt headed in a different direction, down Wilbraham Road. As the vehicle slowed at the traffic light, with the headlights now off, the defendant opened the rear passenger window, leaned out and fired six shots at the people standing on the first-floor porch and steps of the house at 338 Wilbraham Road. Arnold did not see the defendant fire the shots because his view was obstructed by the two duffel bags on his lap, but he saw the defendant pull his upper body back into the car after the shooting holding a black object that looked like a gun, and heard the defendant yell, "SWAT Team."[2] No other eyewitness identified the defendant as the shooter.

After the shooting, Godbolt drove to Morales's home and returned the pistol to Morales. The defendant wiped the gun with his T-shirt before placing it in Morales's black bag, and said that he "just did the hit on Bristol." In the early hours of the next day, the defendant visited the home of Paul Fowler, who was one of the founders of the SWAT Team, and told Fowler that he "just went riding to the . . . other side," which Fowler understood to mean that the defendant had been riding through another group's territory. When Fowler drove his girl friend home that night, the defendant came along and suggested they drive down Wilbraham Road, where they saw that the police had secured the crime scene. The defendant said, "This is the spot I just hit up," adding that he was riding through, stuck his hand out the window, and started firing. He

---

[2]No witness who was on the porch at the time of the shooting reported hearing those words spoken after the shooting.

then said, "I don't know if I hit anyone. It was probably one of those Bristol Street boys."

At approximately 4 P.M. on May 11, Morales gave the pistol to Aaron Jackson. Around 7 P.M. that night, a Springfield police officer responded to a street disturbance and pulled his cruiser up next to Jackson, who ran away from the cruiser and later threw a firearm over a fence. The firearm, a .40 caliber Glock semiautomatic pistol, was soon retrieved. Sergeant John Crane of the State police, a firearms examiner, compared cartridges test-fired from this pistol with the six cartridge cases that were retrieved from the scene of the shooting, and determined that this pistol had fired the six shots.[3]

On May 12, after it was reported in the media that a fourteen year old girl had been killed in the shooting, the defendant returned to Morales's home and, when asked about the incident, said that he "didn't mean for this shit to happen." He explained that, "when I was shooting, the dude pulled the girl in front of him." Fowler also saw the defendant and asked the defendant whether he felt bad that the girl had been killed, and the defendant replied that he did.

*Discussion.* 1. *Jury selection protocol.* Although this was not an interracial killing, the judge agreed to ask the prospective jurors whether the fact that the defendant was African-American would affect their ability to render a fair and impartial verdict, and whether they believed that African-Americans had a tendency to commit crimes more than persons of other races. The judge did not wish to ask the venire to answer these questions of racial bias in open court by raising their hand if they answered in the affirmative. Instead, the judge proposed that he ask the prospective jurors to make a "mental note" if they answered any of his questions in the affirmative and call to sidebar for individual voir dire only those jurors who admitted to having made such a "mental note" as to any of the questions the judge had asked. Defense counsel expressed his concern about this

---

[3]The pistol was examined by Christine Lemire, a deoxyribonucleic acid (DNA) analyst at the Massachusetts State police crime laboratory, who found that at least three persons contributed to a mixture of DNA on the pistol. The defendant and Alexander Vaughn were excluded as potential contributors of the DNA; Donnell Godbolt was not excluded. No latent fingerprints were found on the pistol.

procedure, fearing that prospective jurors would forget that they had made mental notes or decide not to raise the issue at sidebar. He preferred that prospective jurors be asked the questions that did not involve racial bias in open court and be told to raise their hand if they answered in the affirmative, and that all the prospective jurors be asked the racial bias questions in an individual voir dire at sidebar, where the prospective juror would also be able to explain any affirmative answer to any of the questions asked collectively.

The judge ultimately pursued a middle course: he instructed jurors not to raise their hands to any of the questions asked collectively but instead to make a "mental note" if their answer was "yes." After asking the questions collectively, he brought every juror individually to sidebar and asked whether the juror would have answered "yes" to any of the judge's questions, and, if so, to explain the reason. The judge also asked the racial bias questions individually at sidebar. Defense counsel reiterated that he preferred the course of action he had proposed earlier but would "leave it to the discretion of the court." The defendant now contends that his right to an impartial jury guaranteed by art. 12 of the Massachusetts Declaration of Rights and the Sixth and Fourteenth Amendments to the United States Constitution was jeopardized by the protocol used by the judge in jury selection.

Absent an abuse of discretion or denial of a constitutional right, "we will not interfere with the trial judge in the jury selection process." Commonwealth v. Amazeen, 375 Mass. 73, 83 (1978), quoting Commonwealth v. McKay, 363 Mass. 220, 223 (1973). See Commonwealth v. Lopes, 440 Mass. 731, 736 (2004) ("The scope of voir dire rests in the sound discretion of the trial judge, and a determination by the judge that a jury are impartial will not be overturned on appeal in the absence of a clear showing of abuse of discretion or that the finding was clearly erroneous"). Where, as here, all the prospective jurors were brought individually to sidebar and asked whether they had answered any question in the affirmative, we conclude that the judge's unorthodox practice did not constitute an abuse of discretion or deny the defendant his right to an impartial jury.[4]

────────────

[4]Many prospective jurors informed the judge at sidebar that they had made

However, we do not favor this protocol and discourage judges from using it. A judge properly may decide that prospective jurors should not be asked to answer certain questions in open court where the answer may embarrass them or reveal private information. The judge here appropriately decided that the racial bias questions should be answered at sidebar in individual voir dire. Having so decided, there was no need to ask the jurors to make a "mental note" of an affirmative answer to the other questions he asked of the venire, which did not address racial bias or otherwise pose a risk of embarrassment or of revealing private information. The judge collectively asked the venire eighteen questions that did not inquire into racial bias, including a question asking whether the prospective jurors knew or were related to any of the nearly fifty persons who were identified as possible witnesses in the case. The better practice is to ask jurors to raise their hands in response to each question when they answer in the affirmative, request court officers to read the

a mental note of an affirmative answer. Of course, one consequence of this protocol is that we cannot know whether any jurors forgot to inform the judge of their unspoken affirmative answer or answers.

The defendant notes that juror no. 72, after having been seated as a juror and after hearing at trial the ballistics testimony of Sergeant John Crane of the Massachusetts State police, informed the judge that he and Crane used to live in the same town and were friends, but they had not spoken in eight years. Although the venire had been asked whether they knew any of the potential witnesses or any individuals associated with the case, and Crane's name was among those listed, the juror had not mentioned his connection to Crane at sidebar during jury selection. The defendant suggests that, had the judge allowed prospective jurors to raise their hands to questions asked of the venire, this juror would have raised his hand to the question and the defendant would have used a peremptory challenge to strike the juror. The record does not support this conclusion. After observing Crane's testimony, the juror explained that he "stumbled with the name," having not seen or spoken with the witness for approximately eight years. We cannot conclude that the juror immediately recognized the name when it was listed among the many possible witnesses, and simply forgot to mention it during the individual voir dire.

After the juror assured the judge that he could still be fair and impartial and could separate his former relationship with the witness from his evaluation of the witness's testimony, the judge did not abuse his discretion in denying the defendant's motion to excuse the juror. See *Commonwealth* v. *Womack*, 457 Mass. 268, 281 (2010) (judge could rely on jurors' statements that they remained impartial); *Commonwealth* v. *Sleeper*, 435 Mass. 581, 587-588 (2002) (declining to disturb judge's finding of juror impartiality in absence of clear error or abuse of discretion).

juror numbers of those raising their hands into the record, and allow the parties, the judge, and the court clerk to know (and the record to preserve) who answered "yes" to which question, so that a juror can be reminded of the answer if the juror fails to mention it at sidebar during individual voir dire, and appropriate inquiry can take place.

2. *Adoptive admission.* After conducting an evidentiary hearing, the judge denied the defendant's motion in limine and allowed the testimony of seventeen year old Leah Johnson regarding an encounter with the defendant a few days after the shooting. Johnson was walking with two men when she saw the defendant on the street. The defendant and the two men started to argue, and the defendant got into a fist fight with one of the men. After the physical altercation ended, but while the defendant was still arguing with one of the men, Johnson said to the defendant, "That's messed up that you did that to Dymond. Why would you do it? She was only fourteen." Johnson was approximately fifteen feet away from the defendant when she spoke to him, and she spoke loudly enough for him to hear. The defendant did not respond, but gave a "blank look."[5]

Our case law has established certain requirements that must be satisfied before a defendant's silence in the face of an accusation may be considered by the jury as an adoptive admission. "To be admissible, 'it must be apparent that the party has heard and understood the statement, that he had an opportunity to respond, and that the context was one in which he would have been expected to respond to an accusation.' " *Commonwealth* v. *Braley*, 449 Mass. 316, 321 (2007), quoting *Commonwealth* v. *Olszewski*, 416 Mass. 707, 719 (1993), cert. denied, 513 U.S. 835 (1994). See Mass. G. Evid. § 801(d)(2)(B), at 239-240 (2011). "Where a party is confronted with an accusatory statement which, under the circumstances, a reasonable person would challenge, and the party remains silent or responds equivocally, the accusation and the reply may be admissible on the theory that the party's response amounts to an admission of the truth of the accusation." *Commonwealth* v. *Braley*, *supra* at 320-321,

---

[5]At the evidentiary hearing, Leah Johnson described the defendant's reaction by saying, "He looked at me when I said it to him. He looked my way and didn't say anything and then he went back to his conversation or argument."

quoting *Commonwealth* v. *MacKenzie*, 413 Mass. 498, 506 (1992).

The judge did not err in concluding that the evidence was sufficient for the jury reasonably to find that the defendant heard Johnson's statement, that he understood that she was accusing him of the recent killing of the fourteen year old victim, that he had the opportunity to deny it, and that a reasonable person in those circumstances who did not participate in the killing would have denied it. We have concluded in comparable circumstances that a defendant's failure to respond to an accusation was admissible as an adoptive admission. See, e.g., *Commonwealth* v. *Braley, supra* (defendant's failure to respond to accusation that he had "shot into the crowd" admitted as adoptive admission); *Commonwealth* v. *Olszewski, supra* at 718-719 (defendant's silence two weeks after murder when asked, "Why did you do it?," properly admitted as adoptive admission).[6]

3. *Impeachment evidence.* When Arnold testified at trial, he denied speaking with Fowler about the shooting. Fowler, however, testified that he spoke with Arnold after the shooting, and that Arnold told him he was in the car when the shooting took place. When defense counsel asked Fowler what Arnold said happened, the judge sustained the Commonwealth's objection. Defense counsel proffered that Fowler would answer that Arnold said he did not see anything.

The judge erred by excluding this impeachment evidence. A defendant may elicit extrinsic evidence of a material prior inconsistent statement of a prosecution witness for the limited purpose of impeachment. See *Commonwealth* v. *Gil*, 393 Mass. 204, 219-220 (1984); Mass. G. Evid., *supra* at § 613(a)(2), at

---

[6]The judge adequately instructed the jury about the conclusions they must reach before they could consider the evidence of the defendant's silence against him. The judge also instructed the jury to "be cautious . . . to make sure any conclusions you draw are fair ones," noting specifically that "no one is required to respond to every negative comment" and that there may be reasons other than guilt that may explain why a person did not choose to respond. The judge further instructed that, if they were uncertain whether the defendant's alleged silence was an admission, they "should disregard it entirely." See *Commonwealth* v. *Babbitt*, 430 Mass. 700, 705 (2000) ("Because silence may mean something other than agreement or acknowledgment of guilt [it may mean inattention or perplexity, for instance], evidence of adoptive admissions by silence must be received and applied with caution").

188-189. While Arnold testified at trial that he did not see the defendant fire any shots, he did testify that he saw the defendant lean much of his body out the car window while the shots were fired and then come back inside the car after the shooting had stopped holding a black object that looked like a gun. Because these statements were inconsistent with the proffered excluded statement that Arnold was in the car during the shooting but saw nothing, and because the excluded statement was relevant to the credibility of the only witness who was in the car at the time of the shooting, the judge abused his discretion by not admitting the statement for the limited purpose of impeaching Arnold's testimony at trial.

We conclude, however, that the defendant was not prejudiced by the error, because we are confident that "the error did not influence the jury, or had but very slight effect." *Commonwealth v. Christian*, 430 Mass. 552, 563 (2000), quoting *Commonwealth v. Flebotte*, 417 Mass. 348, 353 (1994). Arnold testified at trial that he was limited in what he was able to see during the shooting. He said that he could not see where the shots came from, because his view was blocked by two duffel bags on his lap and he put his head down when he heard shots, and that he initially believed that the shots had been fired at the car. In light of this testimony, the excluded statement would have added little to the jury's over-all evaluation of the credibility of Arnold's testimony.

4. *Transferred intent.* The defendant claims that the judge's instruction to the jury on transferred intent erroneously equated an intent to shoot someone with an intent to kill. The judge's instruction[7] closely paraphrased the instruction on transferred intent that withstood challenge in *Commonwealth v. Pitts*, 403

---

[7]In his final instructions on the law, the judge told the jury:

"I'm going to instruct you now on the issue of transferred intent. If I point a gun at one of my court officers out there intending to kill him or her and when I point that gun I have to have in mind the intent to kill him or her, and by mistake, I miss and hit the court reporter or the clerk, I'm liable for murder for killing the court reporter or clerk because I intended to kill the court officer but accidentally missed. In non-legal terms, that is basically what transferred intent is. It is settled law that if one intends to do a wrongful and an unlawful act which is punishable because it is wrong in and of itself, and in doing so he inflicts an

Mass. 665, 669 & n.6 (1989). Viewing the instruction as a whole, we conclude that there is no significant risk that a reasonable jury would have understood this instruction to mean that a defendant may be found guilty of premeditated murder in the first degree based solely on an intent to shoot someone.

The instruction three times declared in substance that, if the defendant intended to kill one person but missed and killed another, the intent to kill is transferred from the intended victim to the person killed. The defendant focuses primarily on the judge's statement that, "if I intend to shoot one person . . . and accidentally, I hit or injure another, I'm liable for murder, if . . . death results in the case." While we agree that this sentence does not accurately describe what must be proved to establish murder in the first degree based on premeditation, there is no substantial likelihood of a miscarriage of justice where, as here, this sentence is preceded by a sentence stating that an intent to kill is required and followed by two sentences stating the same point.[8],[9] When we consider the entirety of the judge's

---

unforeseen injury, he's criminally liable for that injury. So it is a familiar rule . . . that if I intend to shoot one person, . . . and accidentally, I hit or injure another, I'm liable for murder, if of course death results in the case. So if without . . . mitigation, I intend to kill one person and I miss, and I kill another person, then I can be guilty under a theory of transferred intent, the intent to kill one that I did not intend to kill or missed and gets transferred over to the intent to kill the one I hit. So if you find . . . based on the evidence that the defendant . . . set out to kill another and instead he killed [the victim], then he's guilty of murder as if he originally intended to kill [the victim]. That is what we mean when we say that the law deals with the issue of transferred intent."

After his final instructions, but before the jury commenced their deliberations, in response to the Commonwealth's objection that the judge's transferred intent instruction had not addressed the two other prongs of malice sufficient for a conviction of murder in the second degree, the judge added: "[I]f a person intends to shoot at someone and misses and hits someone else, that intent to kill the first person is transferred over to the one that was killed. The same transferred intent theory applies to second degree murder, as it does to first degree murder."

[8]The defendant on appeal also objects to the sentence, "It is settled law that if one intends to do a wrongful and an unlawful act which is punishable because it is wrong in and of itself, and in doing so he inflicts an unforeseen injury, he's criminally liable for that injury." While we do not think this general statement to be error, we do not think it helps a jury understand transferred intent where an indictment charges murder in the first degree.

[9]Because the defendant objected to the judge's giving an instruction on

instruction regarding murder in the first degree, including the judge's explicit instruction that "[m]alice as it applies to deliberately premeditated murder, means a specific intent to cause death," and that deliberate premeditation requires a "decision to kill," we are confident that this isolated error played no role in the jury's verdict.[10]

5. *Clarity of the jury's finding.* The jury were only instructed as to one theory on which they could find the defendant guilty of murder in the first degree, which was that the crime was committed with deliberate premeditation. The jury were instructed generally that their verdicts must be unanimous with regard to any verdicts or theories on which they relied. In filling out the verdict slip furnished to them, the jury checked the space indicating that they had found the defendant guilty of murder in the first degree, but did not check off the space beneath it indicating that their conviction was based on the theory that the crime was "[c]ommitted with deliberately premeditated [m]alice aforethought." The jury unanimously affirmed in open court that they found the defendant guilty of murder in the first degree.

Out of the presence of the jury, the judge then brought to the attention of counsel the failure of the foreperson to check the theory of deliberate premeditation on the verdict form. Defense counsel questioned whether the jury had found the defendant guilty of murder with deliberate premeditation based on the failure to check that box. When the judge asked defense counsel

transferred intent, but did not object to the language of the instruction, we do not consider the issue preserved and review for a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Vinnie*, 428 Mass. 161, 164 n.3, cert. denied, 525 U.S. 1007 (1998) (issue not preserved where defense counsel objected, but not for reason raised on appeal). We note, however, that the defendant would fare no better if we applied the prejudicial error standard.

[10]The defendant also argues that the judge "played to the fears of the jurors that they too could have been the innocent victims of a shooting" by explaining transferred intent with a hypothetical example in which the judge intends to kill one of his court officers but misses and hits the court reporter or the clerk. We are cognizant of the risk that a prosecutor's argument or even a jury instruction may improperly put the jury in the position of a victim, see *Commonwealth* v. *Fletcher*, 435 Mass. 558, 568 n.6 (2002), but we do not believe that the judge's instruction did so. We recognize that a hypothetical example to illustrate a legal doctrine can be very useful to a jury, provided it is not unnecessarily close to one party's version of the facts. See *Commonwealth* v. *Fisher*, 433 Mass. 340, 346 (2001).

whether he wanted "judicial inquiry" of the jurors, defense counsel said, "I think maybe we should." The judge ultimately decided that no inquiry of the jury was necessary because deliberate premeditation was the only theory on which the jury could have found the defendant guilty of murder in the first degree, and defense counsel noted what we construe to be an objection. The defendant contends that a new trial is required because the jury's guilty verdict of murder in the first degree is inconsistent with their failure to check the space for the theory of deliberate premeditation, as that was the only theory on which the defendant could be found guilty of murder in the first degree.

In a case charging murder in the first degree, where the prosecution proceeds on more than one theory of culpability (deliberate premeditation, extreme atrocity or cruelty, or felony-murder), the jury must be instructed that they must be unanimous as to the theory or theories on which they find the defendant guilty and the verdict slip must indicate the theory or theories on which they found the defendant guilty. See *Commonwealth* v. *Santos*, 440 Mass. 281, 287-288 (2003); *Commonwealth* v. *Berry*, 420 Mass. 95, 112 (1995). See also *Commonwealth* v. *Accetta*, 422 Mass. 642, 646-647 (1996) (requiring specific unanimity and special verdict form where multiple theories of manslaughter charged). We do not require, however, that the verdict slip identify the theory on which the jury found the defendant guilty where only one theory is presented to them, because in such cases there is no ambiguity as to the theory on which the jury rested their guilty verdict and no risk that they were not unanimous in finding guilt based on that theory.

Where, as here, the jury are instructed on only one theory of murder in the first degree and a general verdict of murder in the first degree is returned, the verdict is not defective because the jury failed to specify that they found the defendant guilty on that theory. Nor, where the jury are instructed that deliberate premeditation is a required element of murder in the first degree, is there any reason to believe that the jury's failure to check the space for deliberate premeditation suggested that they found the defendant guilty without finding deliberate premeditation. Because the verdict slip was not ambiguous as to the theory of guilt found by the jury and did not raise any reasonable doubt

as to whether the jury were unanimous in finding guilt on that theory, the judge did not err in refusing to ask the jury to clarify their verdict on the verdict slip.

6. *Relief pursuant to G. L. c. 278, § 33E.* We have reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E, and have considered two issues that were not raised on appeal. First, we have considered whether the evidence at trial was sufficient as a matter of law to support the jury's finding of an intent to kill, which is necessary for a finding of murder in the first degree on a theory of premeditation. We conclude that the evidence was sufficient where the defendant, in a slowly moving vehicle and from a relatively short distance, fired six shots at a porch where seven or eight people were gathered. "[A]n intent to kill may be inferred from the defendant's conduct," *Commonwealth* v. *Henson*, 394 Mass. 584, 591 (1985), and here, the jury could infer such intent from the number of shots fired at the porch, the number of persons who were on the porch, and the proximity of the defendant to the porch when the shots were fired. See *Commonwealth* v. *Castro*, 438 Mass. 160, 165 (2002) (sufficient evidence of intent to kill where defendant, after altercation, stated that he would return, came back armed, knocked on window, and then fired three shots through window and one at door); *Commonwealth* v. *Reaves*, 434 Mass. 383, 390 (2001) (sufficient evidence of intent to kill in drive-by shooting where at least two shots were fired from reasonably close range at individuals with whom defendant had confrontation earlier that day).

Second, the trial judge did not permit jurors to take notes during the trial, which included the testimony of twenty witnesses over four days.[11] Perhaps as a result, the jury during deliberations made two requests ("We would like the report of Robert Morales's testimony regarding comments made during the return of the gun," and "[w]e would like to know the time that the first police cruiser arrived at the crime scene"), and asked one question ("Who was the person who asked [the defendant] if he felt bad about the shooting?"). The judge in reply told the jury to rely on their collective memories.

Juror notetaking in Massachusetts dates back to the Boston

---

[11]The record does not indicate any objection to this decision by either party.

Massacre trial, where it has been reported that at least two jurors took notes. See *Commonwealth* v. *St. Germain*, 381 Mass. 256, 267 n.18 (1980), citing H.B. Zobel, The Boston Massacre 271 (1970). Yet notetaking was long disfavored, largely because of concerns — in a time of low literacy rates — that notetaking would distort the jury's decision-making process and give undue influence to particular jurors and their written notes. *United States* v. *Davis*, 103 F. 457, 470 (W.D. Tenn. 1900), aff'd, 107 F. 753 (6th Cir. 1901) ("[T]he practice is an improper one. . . . It gives the juror taking notes an undue influence in discussing the case when he appeals to his notes to settle conflicts of memory"). See *Watkins* v. *State*, 216 Tenn. 545, 553 (1965) ("It is easily understood why early common law judges would not allow note-taking by jurors. . . . The suspicion that the lettered man would be overly persuasive with his illiterate juror colleagues in the jury deliberations . . . was probably well founded at that early time"). In 1905, we rejected a defendant's claim that a new trial should be granted because a juror was discovered to have been taking notes, but we declared that notetaking, although "not illegal," "may not be a commendable practice." *Commonwealth* v. *Tucker*, 189 Mass. 457, 496-497 (1905) (leaving juror notetaking to discretion of trial judges).

In Massachusetts, notetaking received official recognition in 1978 with the enactment of Rule 8A of the Rules of the Superior Court (1978), which allows a Superior Court judge to permit jurors to take notes in the judge's discretion and requires judges to provide appropriate guidelines. In *Commonwealth* v. *St. Germain*, *supra* at 268-269, we again upheld the permissibility of juror notetaking where a defendant argued that notetaking interfered with the jury's evaluation of the evidence. The defendant claimed that juror notetaking posed a number of risks, specifically:

> "(1) that the best note taker will invariably dominate the jury; (2) that jurors are not trained in the art of note taking and thus will take down trivial matters and overlook vital facts; (3) that a dishonest juror may falsify his notes; (4) that the notes will receive undue attention during deliberations, often resulting in a debate on whose notes

are correct; and (5) that note taking will distract the jurors from watching the witnesses' behavior or may result in the jurors missing other testimony."

Although we rejected the defendant's claims as speculative and observed that notetaking was widely permitted in other jurisdictions, we recognized that experience and empirical studies might shed light on the desirability of notetaking by juries. *Id.* at 267-269. Since *Commonwealth* v. *St. Germain, supra,* our treatment of juror notetaking has continued its shift from the early skepticism of *Commonwealth* v. *Tucker, supra,* to a recognition that juror notetaking should be permitted, at least at the discretion of the trial judge. See *Commonwealth* v. *Dykens,* 438 Mass. 827, 832 (2003); *Commonwealth* v. *Wilborne,* 382 Mass. 241, 253 (1981).

Today, empirical studies and judicial experience have dispelled the concerns that once caused juror notetaking to be regarded as an undesirable practice. Studies have indicated that notetaking does not distract jurors, does not produce a distorted or inaccurate record of the case, and does not give notetakers undue influence over those jurors who did not take notes. See Heuer, Increasing Juror Participation in Trials Through Note Taking and Question Asking, 79 Judicature 256, 258-259 (1996) (summarizing results).

Other States, and the American Bar Association (ABA), have come to similar conclusions. See Standard 15-3.5 of the ABA Standards for Criminal Justice: Discovery and Trial by Jury (3d ed. 1996) ("During the trial of the case, the jurors should be permitted to make notes and keep these notes with them when they retire for their deliberations"). In Arizona, where jurors in criminal cases have long been permitted to take notes, see Ariz. R. Crim. P. 18.6(d), a committee of the Supreme Court concluded that the practice was successful and resulted in no material disadvantages. Jurors: The Power of Twelve, Report of the Arizona Supreme Court Committee on More Effective Use of Juries 83-84 (1994). Specifically, Arizona found that notetaking led to increased attention, fewer requests for read-back of testimony during deliberations, enhanced ability of jurors to refresh their memories from their notes, and improvements in juror morale and satisfaction. *Id.* at 84. Like Arizona, numerous

States now require that jurors be permitted to take notes during trials, some in all cases and some in particular circumstances.[12]

The jury's inquiries in this case asked for evidence that they may have been able to recall had they been allowed to take notes. While we do not conclude that the judge's refusal to allow notetaking resulted in a substantial likelihood of a miscarriage of justice, we believe that an accurate memory of detailed facts is as important in a court room as it in a lecture hall or board room, where notetaking is almost invariably permitted. We refer the question whether we should revise our rules to require that jurors be permitted to take notes during some or all trials, or whether we should continue to leave such decisions to the discretion of the judge, to this court's standing advisory committees on the rules of criminal and civil procedure.

Having reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E, we find no error that produced a substantial likelihood of a miscarriage of justice, nor any other reason to

[12]See Ariz. R. Civ. P. 39(p) (West 2001) (civil trials); Ariz. R. Crim. P. 18.6(d) (West 1998) (criminal trials); Ark. R. Crim. P. 33.5 (LexisNexis 2011) (criminal trials); Cal. R. Court 2.1031 (LexisNexis Supp. 2011) (criminal and civil trials); Fla. Stat. § 40.50 (2010) (civil trials likely to exceed five days); Haw. R. Penal P. 24(e) (2006) (criminal trials, unless on good cause); Haw. R. Civ. P. 47(d) (2000) (civil trials, unless on good cause); Idaho Crim. R. 24.1 (2010) (criminal trials); Idaho R. Civ. P. 47(o) (2010) (civil trials); 705 Ill. Comp. Stat. § 315.1(b) (West 2011) (petit jurors); Ind. Jury R. 20(a)(4) (LexisNexis 2011) (petit jurors); Iowa Code Ann. R. 2.19(5)(e) (West 2002) (criminal trials); Iowa Code Ann. R. 1.926(1) (West 2002) (civil trials); La. Code Civ. Proc. Ann. art. 1794 (West 2003) (civil trials); La. Code Crim. Proc. Ann. art. 793 (West 1998) (criminal trials, on agreement of defendant and State); Md. R. Civ. P. 2-521(a) (LexisNexis 2010) (civil trials, at request of any party); Md. R. Crim. P. 4-326(a) (LexisNexis 2010) (criminal trials, at request of any party); Minn. R. Crim. P. 26.03(13) (West 2010) (criminal trials); Mo. R. Civ. P. 69.03 (West 2010) (civil trials, on court's own motion or at request of any party); Pa. R. Civ. P. 223.2 (2011) (civil trials expected to last more than two days); Tenn. R. Crim. P. 24.1(a)(1) (LexisNexis 2010) (criminal trials); Tenn. R. Civ. P. 43A.01 (LexisNexis 2010) (civil trials); Utah R. Crim P. 17(l) (LexisNexis 2011) (criminal trials); Utah R. Civ. P. 47(n) (LexisNexis 2011) (civil trials); Wash. Super. Ct. Crim. R. 6.8 (West 2011) (Superior Court criminal trials); Wash. Super. Ct. Civ. R. 47(j) (West 2011) (Superior Court civil trials); Wash. Crim. R. for Cts. of Limited Jurisdiction 6.8 (criminal trials in courts of limited jurisdiction) (West 2011); Wash. Civ. R. for Cts. of Limited Jurisdiction 38(h) (West 2011) (civil trials in courts of limited jurisdiction); Wyo. R. Crim. P. 24.1(a) (LexisNexis 2010) (criminal trials); Wyo. R. Civ. P. 39.1 (LexisNexis 2010) (civil trials). See also *State* v. *Kipf,* 234 Neb. 227, 254 (1990) ("henceforth, jurors shall be permitted to take notes if, and only if, the parties agree").

order a new trial or to reduce the defendant's murder conviction to a lesser degree of guilt.

*Judgments affirmed.*