NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12475

COMMONWEALTH  vs.  ADRIAN T. LOYA.


Barnstable.      November 8, 2019. - February 6, 2020.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, & Budd, JJ.


Homicide.  Criminal Responsibility.  Insanity.  Practice,
    Criminal, Capital case, Instructions to jury, Request for
    jury instructions, Acquittal by reason of insanity.



    Indictments found and returned in the Superior Court
Department on July 1, 2015.

    The cases were tried before Gary A. Nickerson, J.


    Theodore F. Riordan (Deborah Bates Riordan also present)
for the defendant.
    Elizabeth A. Sweeney, Assistant District Attorney, for the
Commonwealth.


    LENK, J.  On February 5, 2015, the defendant broke into

Lisa Trubnikova's home.  He confronted her in the bedroom, where

she lay beside her wife, Anna Trubnikova.[1]  The defendant shot

_____

    [1] Because Lisa Trubnikova and Anna Trubnikova share a last
name, we refer to them by their first names.

both women, killing Lisa and wounding Anna.  Before finally surrendering to police, the defendant also shot and wounded a responding police officer, Jared P. MacDonald.

For more than one year, the defendant had been obsessed with killing Lisa, and in turn being killed by police.  The defendant eventually reduced this intended murder-suicide in a detailed, written plan labeled "Operation Purple Rebel" in his electronic files.  At trial, the defendant argued that this obsessive and self-destructive plot showed that the killing was not born out of malice; rather, he was mentally disturbed.  Counsel unsuccessfully claimed that a mental disorder caused the defendant to suffer delusions that compelled him to plan and commit the crime.  On appeal, the defendant contends that our current law on criminal responsibility made this defense not viable, and therefore, because he was deprived of his only defense, a new trial is required.  Alternatively, the defendant asks us to reduce the verdict, pursuant to our authority under G. L. c. 278, § 33E.

We discern no reason to order a new trial or to reduce the conviction.  Accordingly, we affirm the convictions.

1.  Background.  a.  Facts.  We recite the facts as the jury could have found them, in the light most favorable to the Commonwealth, reserving certain details for later discussion.

The defendant first met Lisa in 2011, when they served together in the United States Coast Guard at a base in Kodiak, Alaska. They worked together in an information technology office, and they developed a fast friendship.

Their relationship took a dramatic turn in September of 2012 following an incident at Lisa's home. According to the defendant, Lisa invited him over to have drinks and watch some video recordings. While he was there, however, Lisa became intoxicated and attempted to seduce him. Although Lisa had no sexual contact with the defendant, this incident affected him so deeply that he would later refer to it as a "rape of the mind."

The defendant eventually reported the encounter to his superiors. In June of 2013, he was transferred from Kodiak to Chesapeake, Virginia. On the day he arrived at his new base, the Coast Guard issued the defendant a "Page 7" reprimand for his role in the incident and ordered him to cut off all contact with Lisa and her wife Anna. The defendant was shocked and refused to sign the letter acknowledging the outcome of the Coast Guard's investigation. He felt wronged, and this feeling turned to anger.

These events coincided with a deterioration of the defendant's mental health. He became depressed, started taking Benadryl to help him sleep, and lost interest in the few activities that previously had interested him, such as playing

video games.  The defendant also began to harbor a hatred for the woman he blamed for his misfortune:  Lisa.  As his life seemed to unravel around him, the defendant ultimately decided that he no longer wanted to live.  He did not want to die, however, without seeking vengeance.  Therefore, he resolved to take Lisa's life.

Over the following months, the defendant meticulously planned his killing.  Through the Internet, he learned that Lisa and Anna had relocated to the town of Bourne on Cape Cod.  In October of 2014, he traveled to Massachusetts and set up hunting cameras outside their new home to confirm that Lisa was living there.  When he returned home, he also began playing shooting games with plastic replica weapons, using plastic bullets,[2] to gain more experience with wielding weapons in a combat situation.  In the midst of these preparations, the defendant documented his troubled history with Lisa, the downward spiral of his professional and personal life, and his plot to kill Lisa in a 250-page manifesto entitled "The Wrath of Loya."[3]  After

---

[2] The defendant obtained these weapons, sold for use in casual and competitive games, from a commercial manufacturer.

[3] The electronic file containing the manifesto was titled "The Loya Wars."  The titles were references to the science fiction television and movie series Star Wars and Star Trek, respectively.  Both series featured prominently in other aspects of the crime, including insignia the defendant wore during the

months of planning, he ultimately decided to carry out the killing on February 5, 2015, his thirty-first birthday.

On February 1, 2015, the defendant left his home in Chesapeake, Virginia, and began making his way to Massachusetts. He arrived on February 3, 2015, checked into a local hotel, and prepared for the fatal encounter. His original plan was to attack Lisa at her house, force her to confront what he had become, and stab her in the heart.[4] He did not intend to harm Anna. The defendant originally planned to cover Anna's ears with "ear protection" so that she would not have to hear any sounds that Lisa might make as she was dying. Once Lisa was dead, the defendant then would provoke a firefight with police so that they would shoot and kill him.

The defendant arrived at Lisa's house shortly before 2 A.M. on February 5, 2015.[5] He parked his vehicle across the road approaching her house, and set it on fire to obstruct police

---

shooting. Dr. John Daignault identified these references as further evidence of the defendant's delusional disorder.

[4] Many details of the defendant's planning and the commission of the crime come from his statements to police. As Dr. Martin Kelly, an expert called by the Commonwealth, noted, the defendant's recollection of these events was unusually precise. Kelly identified this "Eidetic memory" as further evidence of the defendant's mental disorder.

[5] Most of the following encounter was captured on video recording by a body camera that the defendant strapped to his chest. An edited version of this recording was played at trial, and the entire recording was entered as an exhibit.

access.  He also set up smoke grenades, noise makers, and fake explosive devices to further delay first responders.  Having staged the scene, the defendant breached the door to Lisa's house by shooting the lock off with a shotgun.  Once inside, he made his way up the stairs to her bedroom.

The defendant found Lisa and Anna in their bed.  He ordered them to separate, threw handcuffs at them, and demanded that they put on the cuffs.  The women screamed and asked who he was and why he was in their house.  The defendant pulled off his mask, revealing his identity.  Lisa and Anna recognized him, and Lisa shouted his name.  The defendant responded, "See what you did to me" and "This is what I've become because of you."

Lisa apologized to the defendant and said that she never meant to hurt him.  Both women pleaded with the defendant and promised that they would not tell anyone if he left them in peace.  Face-to-face with Lisa, the defendant froze, unsure of how to proceed.

With the defendant momentarily distracted, Lisa and Anna attempted to shield themselves with their mattress.  The defendant exclaimed, "What do you think you're doing?"  Now refocused on completing his "mission," he drew his pistol and fired fifteen shots through the mattress in Lisa's direction.  Eleven bullets struck Lisa, killing her in a matter of seconds.

Four bullets struck Anna. The defendant heard gurgling sounds from Lisa's direction, and he concluded that she was dying.

With his primary objective completed, the defendant intended to die at the hands of the police. He went back outside, retrieved a rifle that he previously stashed in a snow bank, and prepared to engage with responding officers. Soon thereafter, he saw the silhouette of an approaching police officer, Jared MacDonald. The defendant fired four shots at MacDonald; one struck him in the spine.

The defendant then retreated behind the victims' house to wait for more officers to come and end his life. As the minutes slipped by, however, the defendant's resolve to kill himself weakened, and he decided to give himself up. He discarded his weapons, approached the officers with hands raised, and was taken into custody.

b. Procedural history. On July 1, 2015, the defendant was indicted on thirty counts, including murder in the first degree for the shooting death of Lisa.[6] Trial commenced on August 28,

---

[6] The other indictments against the defendant were three counts of assault with intent to murder; three counts of aggravated assault and battery by means of a dangerous weapon; two counts of armed home invasion; two counts of armed assault in a dwelling; three counts of using a firearm in the commission of a felony; two counts of armed kidnapping with bodily injury; one count of burglary and assault on an occupant; one count of burning a motor vehicle; one count of possessing a hoax device;

2017. From the beginning of the trial, defense counsel acknowledged that this case was not a "whodunit."[7] Rather, the key issue at trial was whether the defendant was criminally responsible for his actions.

Four medical professionals testified concerning the defendant's mental condition at the time of the shooting. Each expert opined as to whether the defendant met the standard to establish a lack of criminal responsibility set out in Commonwealth v. McHoul, 352 Mass. 544, 546-547 (1967): "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law" (citation omitted).

Two witnesses testified that the defendant had been criminally responsible, and two testified that he had not. Dr. David W. Holtzen, a forensic psychologist at Bridgewater State Hospital, was asked by the Commonwealth to perform competency

---

one count of assault and battery on a police officer; and ten counts of possessing a large capacity feeding device.

[7] Indeed, defense counsel stated the same in an extensive interview he gave to the Cape Cod Times on the day before trial began. The judge took pains to comment on this interview during empanelment, and to make sure that the article was preserved in the record. Exposure to media coverage was, appropriately, a subject of individual voir dire.

and criminal responsibility examinations of the defendant. He testified that the defendant had not been suffering from any mental disorder or illness at the time of the killing. Dr. Judith Edershein, a forensic psychiatrist based at a large teaching hospital,[8] was engaged by the Commonwealth to reach a determination whether the defendant had been criminally responsible by reviewing the records and other experts' opinions, but she was precluded from speaking with the defendant.[9] She testified that although the defendant had at least one personality disorder, it did not render him incapable of conforming his conduct to the law or appreciating the wrongfulness of his actions.

Another of the Commonwealth's witnesses, Dr. Martin Kelly, a practicing psychiatrist also at a large teaching hospital, interviewed and examined the defendant three times, and reviewed records and the police reports. Kelly testified that the defendant had high functioning Asperger's Syndrome, a disorder on the "autism spectrum," and that the condition was "hardwired"

---

[8] Dr. Judith Edershein also testified that she had graduated from Harvard Law School and become an attorney prior to entering psychiatry and ultimately becoming an assistant professor of psychiatry.

[9] Edershein was retained in December of 2016, after the Commonwealth's first expert, Kelly, completed his report. Edershein did not formally request to interview the defendant until May of 2017, at which point her request was denied by defense counsel.

in the brain, not something that is acquired, readily amenable to treatment, or "episodic." Kelly considered and rejected diagnoses of schizoid personality disorder, major depressive disorder, and delusional disorder. Based on his evaluation of the defendant and having examined the records, including the police reports, Kelly concluded that the defendant "suffered from a mental disease; and that as a result of that mental disease, he lacked the substantial capacity to conform his conduct to the requirements of the law."

The defendant called a single expert, Dr. John Daignault, a forensic psychologist, who previously had been the clinical director of Bridgewater State Hospital. Daignault determined that the defendant had not been criminally responsible for his actions on the night of the shooting, but concluded as well that the defendant suffered from a delusional disorder and did not suffer from Asperger's Syndrome.

After deliberating over the course of three days, the jury convicted the defendant of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty. The jury also found the defendant guilty of twenty-eight of the twenty-nine other indictments. He was found not guilty of armed assault with intent to murder. The defendant filed a notice of appeal in September 2017.

2.  Discussion.  Before us, the defendant argues that a new trial is required because our current law regarding criminal responsibility deprived him of a meaningful defense.  The defendant contends that the trial judge committed reversible error by denying two motions the defendant filed to remedy these flaws.  One motion proposed a verdict slip that presented the jury's decision in a series of yes-or-no questions, in addition to a general verdict of "guilty," "not guilty," or "not guilty, lack of criminal responsibility."  The other motion asked the judge to instruct the jury to consider a verdict of "guilty but not criminally responsible" rather than "not guilty, lack of criminal responsibility."  As appellate counsel acknowledged at oral argument, both motions advocated for a departure from our current law regarding the defense of a lack of criminal responsibility.  We decline to adopt the defendant's recommended changes, and discern no error in the trial judge's decision to deny these motions.

a.  Verdict slips.  At the beginning of trial, counsel filed a motion requesting that the verdict slips include several yes-or-no questions on whether the Commonwealth had met its burden.[10]  Ultimately, however, the defendant expressed

---

[10] By way of illustration, the defendant suggested the following language:

satisfaction with the verdict slips, drafted by the judge, that omitted these questions.  Therefore, as the parties agree, any error in the judge's decision to deny the motion is unpreserved and would be reviewed for a substantial likelihood of a

_____

"1.  Has the government proven that the Defendant committed the act of an unlawful killing of a human being without justification?

"_____Yes                              _____No

"If the answer to the above is yes, proceed to Question 2.

"2.  Has the government proven beyond every reasonable doubt that the Defendant, at the time of such killing, was not suffering from a mental disease or defect?

"_____Yes                              _____No

"If the answer to this question is no, proceed to Question 3. If the answer is yes, proceed to Question 4.

"3.  Has the government proven beyond every reasonable doubt that such mental disease or defect did not affect the Defendant so that [he] was unable to appreciate the wrongfulness of [his] conduct or conform his conduct to the requirements of the law?

"_____Yes                              _____No

" . . .

"4.  Has the government proven beyond every reasonable doubt that at the time of the killing that the Defendant was not suffering from a mental disease or Defect that reduced his capacity to either appreciate the wrongfulness of his conduct or to conform [his] conduct to the requirements of the law?

"_____Yes                              _____No"

miscarriage of justice.  See Commonwealth v. Garcia, 470 Mass. 24, 40 (2014).

"[W]e review these claims to determine whether there was error and, if so, whether it created a substantial likelihood of a miscarriage of justice."  Commonwealth v. Brown, 477 Mass. 805, 814-815 (2017), cert. denied, 139 S. Ct. 54 (2018).  "In analyzing a claim under the substantial likelihood standard, we review the evidence and case as a whole and consider whether any error made in the course of the trial was likely to have influenced the jury's conclusion."  Commonwealth v. Berry, 457 Mass. 602, 618 (2010), S.C., 466 Mass. 763 (2014).  Where there is no error, this court need not reach the question of prejudice.  See, e.g., Commonwealth v. Gomes, 459 Mass. 194, 207 (2011) (analysis stops at determination there was no error).

The defendant's motion most fairly is read as a motion for special questions pursuant to Mass. R. Crim. P. 27 (c), 378 Mass. 897 (1979).[11]  Special questions are "rarely resorted to in criminal trials."  Commonwealth v. Dane Entertainment Servs.,

---

[11] Alternatively, the defendant's motion could be interpreted as a motion for a "special verdict," i.e., one that "involves no determinative, ultimate verdict from a jury but only a statement of facts the jury have found from which the judge determines the appropriate judgment."  Commonwealth v. Licciardi, 387 Mass. 670, 675 (1982).  Only general verdicts are permitted in criminal trials.  See Mass. R. Crim. P. 27 (a), 378 Mass. 897 (1979); Licciardi, supra (recognizing that Massachusetts rules of criminal procedure eliminated special verdicts in criminal trials).

Inc. (No. 1), 389 Mass. 902, 916 (1983), quoting Commonwealth v. Lussier, 333 Mass. 83, 94 (1955).  Although they sometimes may "aid in the disposition of a case," Commonwealth v. Licciardi, 387 Mass. 670, 676 (1982), the decision to issue them typically is "discretionary with the judge."  Dane Entertainment Servs., Inc. (No. 1), supra, quoting Lussier, supra.  We have required special questions only where they are necessary to ensure that, should a jury convict a defendant of an offense, they are unanimous as to the theory of that offense.  Compare Commonwealth v. Santos, 440 Mass. 281, 287-288 (2003) (where Commonwealth pursues multiple theories of murder in first degree, verdict slip must indicate unanimous theory of culpability), with Commonwealth v. Shea, 460 Mass. 163, 175 (2011) (no special question necessary where Commonwealth pursued only one theory of murder in first degree), and Commonwealth v. Arias, 78 Mass. App. Ct. 429, 433 (2010) (no special question required on different methods of committing assault by means of dangerous weapon).

We discern no compelling reason to require special questions when the jury consider criminal responsibility.[12]  Although the criminal responsibility defense presents special

---

[12] We do not decide whether, in other circumstances, special questions may be required for some purpose other than to ensure the unanimity of a verdict.

problems for a jury, see part 2.b, infra, it is unclear how yes-or-no questions on the Commonwealth's burden would help the jury to deliberate fairly on this issue.  Indeed, such questions are at least as likely to steer the jury towards a verdict of guilty.  See Licciardi, 387 Mass. at 676, quoting Commonwealth v. Golston, 373 Mass. 249, 260-261 (1977), cert. denied, 434 U.S. 1039 (1978) (special questions "must avoid any 'tendency to lead the jurors step by step to a verdict of guilty'").  See United States v. Spock, 416 F.2d 165, 182 (1st Cir. 1969) ("There is no easier way to reach, and perhaps force, a verdict of guilty than to approach it step by step").  To the extent that a jury may require additional guidance on how to consider whether a defendant lacked criminal responsibility, the proper source of that guidance is the jury charge.  See Commonwealth v. Wolfe, 478 Mass. 142, 152 (2017) (Lowy, J., dissenting) ("the long-standing principle that the jury are presumed to follow the judge's instructions . . . lies at the very heart of our justice system" [citation omitted]).

Thus, the judge did not abuse his discretion in denying the defendant's motion for special questions to which he was not entitled.

b.  Jury instructions.  In addition to his motion for special questions, the defendant filed a "Motion to Permit the Jury to Consider Whether the Defendant is Guilty But Insane."

Through this motion, he requested that the jury consider a verdict of "guilty but not criminally responsible," rather than the verdict set forth in the then-existing model instruction, "not guilty by reason of lack of criminal responsibility." See Model Jury Instruction on Homicide 11 (2013).

At the charge conference, however, defense counsel did not renew this request, and ultimately declared himself satisfied with the judge's instructions on criminal responsibility. We therefore review the judge's decision to deny this motion for a substantial likelihood of a miscarriage of justice. See Brown, 477 Mass. at 814-815.

The defendant argues that the option of finding him "guilty but not criminally responsible" was necessary in order for the jury fairly to consider the role that mental illness played in his crimes. The defendant maintains that, to the average juror, a finding of "not guilty" is tantamount to a finding of factual innocence. In addition to potentially confusing the jurors, the defendant argues, this formulation requires them to compartmentalize their knowledge of the defendant's actions and separately to consider if he nonetheless was not guilty. The defendant contends that, given the particularly egregious acts

in this case, asking the jury to equate the defendant with the term "not guilty" was simply unrealistic.[13]

Without discounting these concerns, we conclude that the instruction the defendant requested was not warranted. Instructing the jury to consider a verdict of "guilty but not criminally responsible" would be inconsistent with our long-standing jurisprudence on criminal responsibility. As the defendant acknowledged at trial, he can point to no Massachusetts authority that supports his requested language.

Furthermore, the defendant's requested instruction would invite unnecessary confusion. A verdict of "guilty but not criminally responsible" is an oxymoron: if the Commonwealth is unable to prove a defendant is criminally responsible beyond a

---

[13] "[E]xperience in this Commonwealth has shown that it is most difficult for a defendant to prevail on a claim of insanity." Commonwealth v. Keita, 429 Mass. 843, 854 (1999), overruled on another ground by Commonwealth v. Lawson, 475 Mass. 806 (2016). Jurors' objections to the criminal responsibility defense, particularly in the homicide context, are well-documented outside the Commonwealth as well. See Brooks, Guilty by Reason of Insanity: Why a Maligned Defense Demands a Constitutional Right of Inquiry on Voir Dire, 20 Geo. Mason L. Rev. 1183, 1202-1203 (2013); Grachek, The Insanity Defense in the Twenty-First Century: How Recent United States Supreme Court Case Law Can Improve the System, 81 Ind. L.J. 1479, 1487-1488 (2006). This resistance may stem from suspicions that defendants malinger, and that the expert testimony on which a criminal responsibility defense depends is susceptible to bias. See Sanders, Expert Witness Ethics, 76 Fordham L. Rev. 1539, 1575-1577 (2007). In any event, it is clear that jurors do not easily reach the "chilling determination that the defendant is an insane killer not legally responsible for his acts." Commonwealth v. Mutina, 366 Mass. 810, 822 (1975).

reasonable doubt, the defendant is not guilty.  See Commonwealth v. Bruneau, 472 Mass. 510, 517 (2015); Golden, petitioner, 341 Mass. 672, 674 (1961) (affirming "the undoubted premise that one acquitted by reason of insanity has been found guilty of no crime").  To make sense of this instruction, the jury would have to parse the difference between factual "guilt" in the context of criminal responsibility and legal "guilt" as it applies to the charges as a whole.  Particularly in light of the other complications that the jury face when considering criminal responsibility, it would be unwise to add this complexity to the equation.

The nomenclature the judge used, "not guilty by lack of criminal responsibility," was proper.  This language has deep roots in our common law.  See Commonwealth v. Green, 17 Mass. 515, 515 (1822) (defendant "found not guilty, by reason of insanity").[14]  We recently affirmed this formulation in our Model Jury Instructions on Homicide.  See Model Jury Instructions on Homicide 10-11 (2018).  The Legislature similarly has employed, and thereby sanctioned, this language.  See G. L. c. 123, § 16 (establishing commitment procedures for those found "not guilty by

---

[14] We since have moved away from the formulation "by reason of insanity," see Commonwealth v. Goudreau, 422 Mass. 731, 738 (1996) (Appendix), in favor of "by reason of a lack of criminal responsibility."  See Model Jury Instructions on Homicide 10-11 (2018).

reason of mental illness or mental defect").  It was not error for the judge to rely upon this well-established formulation.

Viewing the entire jury charge in light of the evidence at trial, it is clear that the issue of criminal responsibility was properly and fully before the jury.  The judge accurately explained the law on criminal responsibility before commencing to instruct on the numerous specific offenses with which the defendant had been charged.  When discussing each offense, the judge again reminded the jury that even should they find that the elements were met, they still had to consider whether the defendant was criminally responsible.[15]  These instructions informed the jury that they could recognize that the defendant had committed unlawful acts, but still find him not guilty by reason of lack of criminal responsibility.[16]

---

[15] The judge also informed the jury that they could consider the role that mental illness might have played in the defendant's ability to form the requisite intent for certain offenses.

[16] To the extent that a defendant may seek further clarification in future cases, a better practice would be for the judge to provide an additional instruction on the relationship between criminal responsibility and factual guilt. An appropriate instruction would mirror the language we sanctioned in Commonwealth v. Odgren, 483 Mass. 41, 52 (2019): "If you are satisfied beyond a reasonable doubt . . . that the defendant committed a crime, you must decide whether the Commonwealth . . . prove[d] that the defendant was criminally responsible beyond a reasonable doubt."  This language would clarify that a verdict of not guilty by reason of lack of criminal responsibility necessarily includes a conclusion that

With these instructions in hand, the jury were well equipped to consider the evidence from both sides that bore on the defendant's responsibility:  the opinions of four expert witnesses;[17] the video recording of the defendant's planning and commission of the offense; the defendant's recorded statements to police; and the defendant's manifesto.  The jury deliberated over a period of three days before reaching their verdicts.  In sum, the defendant was not deprived of a meaningful defense; the jury rejected it.

c.  Review under G. L. c. 278, § 33E.  Having reviewed the entirety of the record pursuant to our duty under G. L. c. 278, § 33E, we are left with no doubt that mental illness played a central role in this crime.  Nonetheless, although the defendant presented "substantial evidence supporting his insanity defense," Commonwealth v. Brown, 449 Mass. 747, 773 (2007), we discern no reason to exercise our authority under G. L. c. 278, § 33E.  Mental illness does not equate with the absence of criminal responsibility.  The jury could properly credit the opinions of Edershein and Holtzen that, assuming the defendant

---

the defendant committed the act that constitutes the charged offense.  See id. at 52-53; Commonwealth v. Bruneau, 472 Mass. 510, 517 (2015) (not guilty by reason of criminal responsibility verdict "is unlike an acquittal because it includes a finding that the defendant committed the criminal act").

[17] In addition to the witnesses' testimony, by agreement of the parties, each expert's report was introduced as an exhibit.

suffered from a qualifying mental disorder, he nonetheless was able to conform his actions to the law and to understand the wrongfulness of his brutal actions.  Their testimony provided sufficient support for the jury's verdict.  On similar facts, we have concluded that, "[s]ince the issue of the defendant's criminal responsibility was fully and fairly before the jury[,] . . . justice does not require that their verdict be disturbed.'"  Brown, supra, quoting Commonwealth v. Lunde, 390 Mass. 42, 50 (1983).  We likewise conclude that this verdict was consonant with justice.

Judgments affirmed.