## COMMONWEALTH vs. SHEILA BERRY.

Plymouth. September 10, 2013. - January 9, 2014.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, & DUFFLY, JJ.

*Homicide. Mental Impairment. Evidence,* Expert. *Practice, Criminal,* Witness, Capital case. *Witness,* Psychologist, Expert. *Intoxication.*

At a murder trial, no reversible error arose from the admission of an expert witness's opinion testimony that contained an incorrect statement of the governing law (i.e., that although the defendant suffered from a major mental illness, she nevertheless was criminally responsible, in that she could appreciate the wrongfulness of her conduct and conform her behavior to the requirements of the law), where, although it would have been preferable for the judge to have struck this testimony or at least to have instructed the jury that they were to obtain their instructions on the law only from the judge and not a witness, the prosecutor did not refer to the erroneous opinion and the judge clearly stated that the jury were required to accept and follow her instructions and correctly instructed the jury on lack of criminal responsibility. [767-770]

This court exercised its power under G. L. c. 278, § 33E, to reduce a verdict of murder in the first degree, where a verdict of murder in the second degree was more consonant with justice, in that the defendant's mental illness and impaired mental condition drove her behavior in killing the victim and materially affected the fairness of a conviction of murder in the first degree on a theory of extreme atrocity or cruelty. [770-774] GANTS, J., concurring, with whom IRELAND, C.J., and DUFFLY, J., joined.

INDICTMENT found and returned in the Superior Court Department on January 24, 2003.

Following review by this court, 457 Mass. 602 (2010), the case was tried before *Linda E. Giles,* J.

*Kevin S. Nixon* for the defendant.

*Robert C. Thompson,* Assistant District Attorney, for the Commonwealth.

BOTSFORD, J. In March of 2006, a jury found the defendant guilty of murder in the first degree on a theory of extreme

atrocity or cruelty.[1] See *Commonwealth* v. *Berry*, 457 Mass. 602 (2010). This court reversed the defendant's conviction because of an error in the jury instructions on lack of criminal responsibility, and we remanded the case for a new trial. *Id.* at 615-618. The defendant was tried again in October, 2011, and again was convicted of murder in the first degree on a theory of extreme atrocity or cruelty. Before us is the defendant's appeal from that conviction. The defendant argues that the trial judge erred in refusing to strike an expert's testimony that the defendant was criminally responsible; she argues also that in the circumstances of this case, pursuant to G. L. c. 278, § 33E, we should reduce the degree of guilt or order a new trial. For the reasons set forth below, in the exercise of our responsibility under § 33E, we conclude that the interests of justice require a reduction of the degree of guilt to murder in the second degree.

*Background.* The evidence presented in the defendant's second trial was substantially similar to the evidence in the first, and it is summarized in *Commonwealth* v. *Berry*, 457 Mass. at 603-605.[2] A major focus of both trials was on the defendant's mental state at the time of the crime; her defense was lack of criminal responsibility. We summarize here the basic outline of the events leading up to and including the death of the victim, and reserve additional facts for later discussion in connection with our consideration of the entire case under § 33E.

1. *The homicide.* On the night of August 14, 2002, after having dinner with a friend during which she drank two or three glasses of rum, the defendant went to a neighborhood market. An altercation arose between the defendant and a man outside the store, during which he spit on her and punched her in the face, making her furious. The defendant entered the store, swearing and muttering to herself; she grabbed two large beer bottles from the store, went outside, and threw the bottles at the man. She missed but did not stop yelling and screaming. Admilson Goncalves, the victim, arrived at the market on a bicycle. He

---

[1] The jury did not find the defendant guilty on a theory of deliberate premeditation. See *Commonwealth* v. *Berry*, 457 Mass. 602, 602 n.1 (2010).

[2] The testimony of four witnesses who testified at the first trial was read to the jury in the second trial, presumably because the witnesses were not available. The defendant had testified at the first trial, and the Commonwealth read her testimony into evidence at the second as a statement of the defendant.

and the defendant knew each other from the neighborhood, and he tried to calm her. The effort failed; the defendant jumped on the victim's bicycle and rode on it to the home of her friend Deanna Marshall. The victim arrived at the house, seeking to retrieve his bicycle. When Marshall came out of the house, she saw the victim restraining the defendant, holding her against the side of the house; the victim said that the defendant had been hitting him. The defendant was extremely agitated and out of control. Despite agreeing with Marshall to go behind the house to calm herself, the defendant continued to be agitated and angry. She returned to the front of the house carrying a cinder block, walked to the victim, and struck him repeatedly over the back of the head until the cinder block crumbled into pieces. The victim died as a result of severe head injuries.

2. *History of the defendant's mental illness.* The defendant has a long history of mental illness. In 1989, at the age of fourteen, she fell off the roof of a car and hit her head. She was in a coma for some time and also suffered a skull fracture, with damage to the frontal lobe of her brain. After this head injury, there was a marked change in the defendant's "school functioning" and behavior, consistent with mood and personality changes associated with frontal lobe damage. The defendant became aggressive and disinhibited, and she began to show signs of mental illness. She left school in the ninth grade.

In 1994, the defendant was diagnosed with bipolar disorder with psychotic features.[3] Frequent psychiatric hospitalizations followed in which the defendant's behavior was "extremely agitated, aggressive, [and] out of control." She was hospitalized on account of her mental illness several times between 1994 and 1998, despite the fact that she remained on prescribed medication for that entire period. The defendant also suffered from auditory hallucinations and chronic delusions. She believed that she had been raped and "run over," that Osama Bin Laden had been visiting her since she was eight years old, and that she was the "Bionic Woman." The defendant dove out of a plexiglass window during a 1994 admission to McLean Hospital, a psychiatric facility, thinking that she could fly.

---

[3]Thereafter, the defendant was also diagnosed as suffering from schizoaffective disorder and posttraumatic stress disorder.

In 1995, a small cyst or tumor was found on the defendant's cerebellum, a part of the brain that "takes the edge off" and works as a "homeostasis mechanism." By 1999, the tumor had doubled in size and become "space-occupying," meaning that it was exerting pressure on the surrounding area. Hospital records spanning from 1990 to 2003 indicated that the defendant's levels of rage and agitation became gradually "worse and worse," which, in the view of at least one of the expert witnesses,[4] was consistent with the tumor growing and contributed to the defendant's level of aggression.[5] Both experts based their opinions on recent scientific research indicating that a midline tumor on the vernix, where the defendant's was located, was most apt to cause problems with behavior, behavioral discontrol, disinhibition, and aggression.[6]

Very soon after the defendant's arrest in August of 2002, she was committed to Taunton State Hospital (Taunton), where she remained until October, 2003. The defendant was evaluated at Taunton for competency to stand trial and found incompetent two times, in September or October, 2002, and March, 2003. When the defendant arrived at Taunton, she acted "absolutely wild at times and unmanageable"; records indicated that she would be calm one minute and totally enraged the next with little or no provocation. The defendant had to be put in four-point restraints twice while at Taunton because she was unable to control her behavior.

In March of 2003, the defendant also was found incompetent

---

[4]Dr. Bernice Kelly, a psychologist at the Massachusetts General Hospital law and psychiatry service, testified on behalf of the defendant. A second expert witness for the defense, Dr. Malcolm Rogers, a psychiatrist with Brigham and Women's Hospital, originally was retained by the Commonwealth in this case, but when, after examination of the defendant, he formed the opinion that she lacked criminal responsibility, he became a defense witness.

[5]The defendant's medical records reflect not only that her aggressive behaviors often were associated with alcohol use, but also that her inability to control her behavior continued even in the absence of alcohol use.

[6]The Commonwealth's expert witness, Dr. Michael Murphy, a forensic psychologist formerly at Taunton State Hospital, did not give similar weight to this research. The Commonwealth's other expert witness, Dr. Russell Vasile, a psychiatrist at Beth Israel Deaconess Hospital, did not discuss the research at the second trial. However, at the defendant's first trial, Vasile discounted the research and said the tumor's impact on the defendant was minimal. *Commonwealth* v. *Berry*, 457 Mass. at 611.

to make decisions with regard to her need for psychiatric medication, and a court order was obtained to require, with force if necessary, administration of antipsychotic and mood-stabilizing medication. After a period of being on the medication, she began to have fewer verbal outbursts, but she still suffered from psychosis. In April of 2003, the defendant's cerebellar tumor was removed surgically. Thereafter, the defendant displayed a "tremendous improvement," an almost immediate "drastic change in her anxiety level," and "a greater degree of emotional control." According to Dr. Bernice Kelly, one of the defendant's expert witnesses (see note 4, *supra*), the defendant's Taunton medical records indicated that the defendant became more submissive and docile, and her tendency to become enraged with little or no provocation "just went away."

*Discussion.* 1. *Testimony of Dr. Michael Murphy.* The defendant argues that the trial judge erred in declining to strike at least a portion of the testimony of Dr. Michael Murphy, a forensic psychologist who had worked at Taunton during the time the defendant was admitted there and who was called by the Commonwealth as a rebuttal witness to testify about the defendant's mental state. Murphy had interviewed the defendant nine times in the year following her admission to Taunton, and he had performed the defendant's competency evaluations, twice finding her incompetent to stand trial.[7] On direct examination at trial, Murphy testified to his opinion that while the defendant suffered from a major mental illness, schizoaffective disorder, she nevertheless was criminally responsible in that she could appreciate the wrongfulness of her conduct and conform her behavior to the requirements of the law. See *Commonwealth* v. *Berry*, 457 Mass. at 612. On cross-examination, in direct response to a question by defense counsel, Murphy stated:

> "It is my opinion that to the degree that [the defendant's] capacity to inhibit her behavior may have been affected by the taking in of large amounts of alcohol, and she is determined to be responsible for that behavior, that is, it was voluntary behavior on her part, then any diminishment of

[7]Murphy performed all three of the defendant's competency evaluations. After the defendant's tumor was removed in the spring of 2003, she was found competent to stand trial.

her capacity, as is often the case with individuals who engage in criminal behavior while under the influence of substances, would be thought to be behavior for which, in my opinion, she is criminally responsible."

Following this response, the defendant moved to strike Murphy's entire testimony on the ground that Murphy had misstated the law. The judge declined to do so, concluding that while it could be said that Murphy's opinion did not appear to reflect the law accurately, this went to the weight of the opinion, not its admissibility.

On appeal, the defendant argues that the judge committed reversible error in refusing to strike this response by Murphy because his incorrect statement of the governing law was irrelevant and unfairly prejudicial. More specifically, the defendant argues that she suffered prejudice as a consequence of Murphy's misstatement of the law as set out in *Commonwealth* v. *DiPadova*, 460 Mass. 424, 432 (2011).[8]

In *DiPadova*, this court explained that where a defendant suffers from a mental illness that, by itself, causes her to lack the substantial capacity to appreciate the wrongfulness of her acts or to conform her conduct to the law, any voluntary consumption of alcohol or drugs by the defendant does not defeat a defense of lack of criminal responsibility, regardless of whether the defendant knows that such consumption may exacerbate the mental illness. *Id.* at 431. This court further explained that where a defendant who suffers from a mental illness is criminally responsible but through the voluntary consumption of drugs or alcohol loses that responsibility, again a defense of lack of criminal responsibility will not be defeated unless the defendant knows that the consumption will have that effect. *Id.* at 432.[9]

It is clear that Murphy's testimony erroneously stated the law as explained in *DiPadova*, a fact that the trial judge acknowledged

---

[8] The defendant's second trial commenced on October 4, 2011, a little over a month after *Commonwealth* v. *DiPadova*, 460 Mass. 424 (2011), had been decided. The trial record reflects that the trial judge and counsel were aware of the decision at the time of trial.

[9] The Supreme Judicial Court's Model Jury Instructions on Homicide 6-10 (2013) reflect this standard.

during trial. While it would have been preferable for the judge to have struck this erroneous opinion testimony, or at least to have instructed the jury that they were to obtain their instructions on the law only from the judge and not a witness, we do not conclude that her failure to do so constituted an error requiring reversal in this case.[10] Murphy's erroneous opinion was given in direct response to a question posed by the defendant on cross-examination, and it essentially ended there. The prosecutor did not refer to it thereafter, in her closing argument or otherwise. More to the point, in her final charge to the jury, the judge clearly stated that they were required to accept and follow her instructions on the law, and her instructions on lack of criminal responsibility were correct.[11] Moreover, the judge made no mention at any time of the possibility that if the defendant knew alcohol had the effect of activating or exacerbating her mental illness, then in effect a defense of lack of criminal responsibility would not be available to her. See *Commonwealth* v. *Berry*, 457

[10]It is not entirely clear that the defendant's claim concerning Murphy was preserved, because the defendant argued to the trial judge that Murphy's entire testimony should be struck, while on appeal she appears to argue that only the portion of Murphy's testimony quoted in the text should have been struck. We do not need to resolve the issue because, assuming the judge's failure to strike Murphy's quoted opinion testimony was error, for the reasons we discuss, we are reasonably certain that it "had but very slight effect" on the jury. *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), quoting *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983).

[11]The judge informed the jury:

"A defendant's lack of criminal responsibility cannot be solely the product of intoxication caused by his or her voluntary consumption of alcohol or another drug. However, a defendant is not criminally responsible if you have a reasonable doubt as to whether, when the crime was committed, the defendant had a latent mental disease or defect that became activated by the voluntary consumption of drugs or alcohol, which activated or intensified mental disease or defect then caused him or her to lose the substantial capacity to appreciate the wrongfulness of his or her conduct or the substantial capacity to conform his or her conduct to the requirements of the law. . . .

"Where a defendant has an active mental disease or defect that caused him or her to lose the substantial capacity to appreciate the wrongfulness of his or her conduct, or the substantial capacity to conform his or her conduct to the requirements of the law, the defendant's consumption of alcohol or another drug cannot preclude the defense of lack of criminal responsibility."

Mass. at 617 n.9. We assume as a rule that the jury follow the instructions provided to them by the judge, *Commonwealth* v. *Watkins*, 425 Mass. 830, 840 (1997), and we assume so here.

2. *Review pursuant to G. L. c. 278, § 33E.* Our power under G. L. c. 278, § 33E, directs us to consider a defendant's entire case, taking into account a broad range of factors, when determining whether a conviction of murder in the first degree was a miscarriage of justice that warrants a reduction in the degree of guilt. See *Commonwealth* v. *Colleran*, 452 Mass. 417, 430-431 (2008). See also *Commonwealth* v. *Baker*, 346 Mass. 107, 109 (1963) (G. L. c. 278, § 33E, "creates a duty upon our part to consider the degree of guilt. If upon our examination of the facts, we should, in our discretion, be of opinion that there was a miscarriage of justice in convicting the defendant of murder in the first degree, and that a verdict of guilty of murder in the second degree or of manslaughter would have been more consonant with justice, it is now our power and duty so to declare"). But "[r]eview under G. L. c. 278, § 33E, does not convert this court to a second jury" (citation omitted). *Commonwealth* v. *Brown*, 449 Mass. 747, 773 (2007). Rather, our duty pursuant to § 33E is to determine whether the verdict returned is consonant with justice. *Commonwealth* v. *Gould*, 380 Mass. 672, 680 (1980).

Here, the jury concluded that the defendant was criminally responsible for the murder of the victim.[12] Our cases have held consistently that the issue of criminal responsibility is for the jury, see, e.g., *Commonwealth* v. *Brown*, 449 Mass. at 773; *Commonwealth* v. *Fernandes*, 436 Mass. 671, 676 (2002), and we do not intend to disturb the jury's finding on that issue here. However, after a full review of this case, we have reached the conclusion that the defendant's mental illness and impaired mental condition drove her behavior and materially affect the fairness of a conviction of murder in the first degree on a theory of extreme atrocity or 'cruelty. See *Commonwealth* v. *Gould*, 380 Mass. at 684-685 (mental illness and its effect on defendant's conduct should be considered in determining whether defendant committed murder with extreme atrocity or cruelty).

---

[12]In the defendant's first trial, the jury also found her to be criminally responsible, but the judge's instructions on this issue were not correct, requiring reversal of her conviction. *Commonwealth* v. *Berry*, 457 Mass. at 615-616, 618.

The undisputed evidence showed that on the night of August 14, after the defendant's altercation at the neighborhood market, she became enraged. Her rage only escalated once she arrived at Marshall's house. When Marshall met the defendant and the victim outside her house, the defendant was screaming and yelling in a way that Marshall had never seen her act. Marshall told the defendant to go to the backyard to calm down; the defendant paced around the backyard to no avail. She returned to the front of the house and, according to Marshall, became angrier. She returned to the back of the house, only to emerge again with a cinder block, and she hit the victim on the head with it again and again, until the block broke into pieces. Witnesses testified that the defendant was completely "zoned out" during the attack and "was not hearing anything around her," including witnesses' pleas for her to stop. She was "out of control" and growling as she hit the victim. Immediately after the attack, the defendant stared at Marshall's son without speaking and then rode away on the victim's bicycle. When police officers arrived at the defendant's home soon after, they found her out of control and agitated; two officers were needed to handcuff her. At the police station, the defendant would not calm down and, as a result, had to be placed in a cell before booking. The defendant continuously threatened to blow up the police station and the World Trade Center.

At the time of the crime, the defendant clearly suffered from a long-standing and severe mental illness, as all five of the expert witnesses who testified at trial about the defendant's mental state agreed.[13] Of course, as our cases reflect, the fact of a mental illness by itself does not generally warrant reduction of a conviction of murder in the first degree. See, e.g., *Commonwealth* v. *Zagrodny*, 443 Mass. 93, 108 (2004) (declining to order new trial or reduce degree of guilt, noting that "not every defendant suffering from bipolar disorder or other mental illness

---

[13]Schizoaffective disorder and bipolar illness with psychotic features — the defendant's two principal diagnoses — are unquestionably major mental illnesses. Schizoaffective disorder is much like schizophrenia with an affective component; it causes paranoia, psychotic ideas or delusions, and schizophrenic thinking, and inhibits people's ability to control their behavior. Bipolar disorder with psychosis is a mood disorder that causes thoughts "not based in reality" and a person in a manic state to become agitated.

lacks criminal responsibility for his acts''); *Commonwealth* v. *Rosenthal*, 432 Mass. 124, 130-131 (2000) (evidence of mental impairment did not warrant reduction of conviction of murder in first degree on theory of extreme atrocity or cruelty). Rather, G. L. c. 278, § 33E, directs us to examine carefully and individually the law and the evidence in each case. Here, in addition to suffering from a bipolar or schizoaffective disorder, at the time of the homicide, the defendant also had a growing cyst or tumor on her cerebellum. According to the testimony presented by the defendant's experts, such a tumor can cause aggression and emotional instability, and in their opinion, with respect to the defendant, the tumor did have that effect.[14] And of significance — because the Commonwealth's expert witnesses did not share these opinions concerning the behavioral impact of the defendant's cerebellar tumor — the uncontradicted evidence reflected in the defendant's medical records indicated that after the tumor was removed, the defendant's aggressiveness and her ability to control her conduct substantively and markedly improved.[15]

The manner in which the victim was killed in this case was violent and highly disturbing. In the circumstances, "there is no question of reducing the verdict below murder; the question that presents itself is the less drastic one whether there is ground for reducing from first to second degree murder." *Commonwealth* v. *Cadwell*, 374 Mass. 308, 316 (1978).[16] We are convinced

[14]As indicated previously, see *supra* at note 4 and accompanying text, the defendant's experts Kelly and Rogers testified to this point. Defense expert witness Dr. Marilyn Price also opined that the defendant's tumor contributed to her inability to conform her behavior to the requirements of the law on the night of the murder. It is significant as well that the defendant likely also had suffered frontal lobe damage when she fell off a car at age fourteen, some years before the tumor was found. According to the defendant's expert Kelly, frontal lobe damage itself can cause a person to become more aggressive and disinhibited, which were behaviors exhibited by the defendant following the car accident.

[15]The change in the defendant's behavior and attitude is reflected in her copious medical records (as they were described by witnesses) and in the testimony of Murphy and all other expert witnesses, except Vasile, who only interviewed the defendant post surgery.

[16]The intent necessary to be proved for a conviction of murder in the first degree committed with extreme atrocity or cruelty, defined by three alternate prongs, is the same as the intent necessary for murder in the second degree. Compare, e.g., *Commonwealth* v. *Townsend*, 453 Mass. 413, 428-429 (2009)

from our review of the entire record that the defendant's long-standing bipolar or schizoaffective disorder combined with the tumor on her cerebellum were very closely intertwined with her conduct on August 14, 2002, and specifically with her actions in killing the victim.[17] Contrast, e.g., *Commonwealth* v. *Whitaker*, 460 Mass. 409, 419-421 (2011) (no evidence that defendant's psychological diagnosis was intertwined with victim's killing). In particular, we are persuaded that these conditions affected the defendant's conduct in a manner that has an impact on the determination whether the defendant herself committed the murder with extreme atrocity or cruelty.[18] As we did in

(intent for murder in first degree committed with extreme atrocity or cruelty), with *Commonwealth* v. *Sneed*, 413 Mass. 387, 388 n.1 (1992) (intent for murder in second degree). See Model Jury Instructions on Homicide 44, 57 (2013). Taking fully into account the evidence of the defendant's mental illness, cerebellar tumor, and likely frontal lobe damage, we consider the evidence at trial to satisfy at least the third alternate prong of the common definition — i.e., that "in the circumstances known to the defendant, a reasonably prudent person would have known that, according to common experience, there was a plain and strong likelihood that death would follow the contemplated act (the third prong)" (citations omitted). See *Commonwealth* v. *Townsend, supra* at 428; *Commonwealth* v. *Sneed, supra.* As indicated in the text, in deciding that reduction of the verdict here is appropriate and necessary, we focus on the impact of the defendant's mental impairment on her conduct (and ability to control her conduct), not on her intent.

[17]In *Commonwealth* v. *Rutkowski*, 459 Mass. 794, 799 (2011), and *Commonwealth* v. *Gould*, 380 Mass. 672, 685-687 (1980), this court reversed each defendant's conviction of murder in the first degree and remanded the case for a new trial to permit the jury to consider the defendant's long-standing mental illness as an impairment bearing on the question whether the defendant acted with extreme atrocity or cruelty. In the present case, the jury were instructed that they were entitled to consider evidence of the defendant's mental impairment (or consumption of alcohol or drugs) in determining whether the defendant "acted in a cruel or atrocious manner in causing the death of the deceased," but the only time that instruction was given was at the very end of the judge's explanation of the meaning of the word "intent," which she placed in the middle of her instruction on the elements of deliberately premeditated murder and separate from the instruction on murder committed with extreme atrocity or cruelty. In the circumstances, while the jury were indeed informed that they might consider the defendant's mental impairment in relation to their consideration of whether she had committed the murder in a cruel or atrocious manner, the reference was so separated from its intended context that it is somewhat questionable whether the jury actually made the link.

[18]The Commonwealth's expert witnesses opined that the defendant did not lack criminal responsibility in substantial part because of her entirely voluntary consumption of alcohol, which both witnesses considered to be a very significant

*Commonwealth* v. *Colleran*, 452 Mass. at 434, we conclude here that the unusual circumstances of the case make a verdict of murder in the second degree more consonant with justice.

*Conclusion.* The case is remanded to the Superior Court. The verdict of guilty of murder in the first degree and the sentence previously imposed are to be vacated; a verdict of guilty of murder in the second degree is to be entered and sentence is to be imposed thereon.

*So ordered.*

GANTS, J. (concurring, with whom Ireland, C.J., and Duffly, J., join). I concur with the court that "the defendant's long-standing bipolar or schizoaffective disorder combined with the tumor on her cerebellum were very closely intertwined with her conduct" at the time of the killing and that "the unusual circumstances of the case make a verdict of murder in the second degree more consonant with justice." *Ante* at 773, 774. I write separately to explore the reasons why this verdict is not consonant with justice and to consider whether those reasons might suggest the need for us to revisit our homicide jurisprudence regarding extreme atrocity or cruelty in an appropriate case where the issue is raised and fully briefed.

The defendant was convicted of murder in the first degree

---

factor in driving her behavior on the night of the killing. We have considered these opinions carefully but do not find them directly relevant to our consideration whether a verdict of murder in the second degree rather than the first degree is more consonant with justice in this case. As earlier stated, in exercising our review under § 33E, we will not disturb the jury's conclusion, consistent with the opinions of the experts, Murphy and Vasile, that the defendant was criminally responsible. Moreover, similar to the defendant's first trial, the evidence here was almost nonexistent that the defendant herself knew that alcohol was or could be a catalyst that increased the impulsivity, aggressiveness, and hostility associated with her mental illness to a point where she could not control her behavior. See *Commonwealth* v. *Berry*, 457 Mass. at 618-619. Finally, whether or not the defendant's voluntary consumption of alcohol militated against a finding of lack of criminal responsibility, such voluntary consumption is still a factor that, like mental impairment, bears on the assessment whether the defendant acted with extreme atrocity or cruelty. See Model Jury Instructions on Homicide 49 (2013); Model Jury Instructions on Homicide 61-62 (1999).

solely on a theory of extreme atrocity or cruelty. Our model homicide instruction regarding extreme atrocity or cruelty provides in relevant part:

> "Extreme atrocity means an act that is extremely wicked or brutal, appalling, horrifying, or utterly revolting. Extreme cruelty means that the defendant caused the person's death by a method that surpassed the cruelty inherent in any taking of a human life. You must determine whether the method or mode of a killing is so shocking as to amount to murder with extreme atrocity or cruelty. The inquiry focuses on the defendant's action in terms of the manner and means of inflicting death, and on the resulting effect on the victim.

> "In deciding whether the Commonwealth has proved beyond a reasonable doubt that the defendant caused the death of the deceased with extreme atrocity or cruelty, you must consider the following factors:

> "1. whether the defendant was indifferent to or took pleasure in the suffering of the deceased;

> "2. the consciousness and degree of suffering of the deceased;

> "3. the extent of the injuries to the deceased;

> "4. the number of blows delivered;

> "5. the manner, degree and severity of the force used;

> "6. the nature of the weapon, instrument, or method used; and

> "7. the disproportion between the means needed to cause death and those employed. This seventh factor refers to whether the means used were excessive and out of proportion to what would be needed to kill a person.

> "You cannot make a finding of extreme atrocity or cruelty unless it is based on one or more of the factors I have just listed.

> "[Where there is evidence the defendant at the time of

the offense had a mental impairment or was under the influence of alcohol or drugs] You may consider the defendant's mental condition at the time of the killing, including any credible evidence of mental impairment or the effect on the defendant of his consumption of alcohol or drugs, in determining whether the Commonwealth has proved beyond a reasonable doubt that the defendant committed the killing with extreme atrocity or cruelty."

Model Jury Instructions on Homicide 47-49 (2013).

The jury in this case had abundant cause to find that many of the so-called *Cunneen* factors applied to this killing, see *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983), where the defendant struck the victim with a cinder block so often and with such force that the cinder block eventually disintegrated. Under the common law of homicide, a defendant may be found guilty of murder in the first degree with extreme atrocity or cruelty regardless of whether the defendant intended that the murder be extremely atrocious or cruel. See *Commonwealth* v. *Szlachta*, 463 Mass. 37, 47 (2012), citing *Cunneen*, *supra* at 227 ("there is no requirement that a defendant have a specific mental intent or knowledge of the character of his acts beyond malice aforethought to be convicted of murder in the first degree based on extreme atrocity or cruelty"); *Commonwealth* v. *Gilbert*, 165 Mass. 45, 59 (1895) (defendant need not know act was extremely atrocious or cruel in order to commit murder with extreme atrocity or cruelty). The first *Cunneen* factor — that the defendant was indifferent to or took pleasure in the suffering of the deceased — considers the defendant's state of mind, but the other *Cunneen* factors look only to the manner of the killing. If the jury were to rest their finding of extreme atrocity or cruelty on any but the first *Cunneen* factor, the jury need not focus on the defendant's state of mind. Consequently, a defendant may be found guilty of murder in the first degree with extreme atrocity or cruelty where the defendant did not intend that the victim suffer before he died but the victim nonetheless did suffer an agonizing death. See *Szlachta*, *supra*; *Cunneen*, *supra*; *Gilbert*, *supra*.

The *Cunneen* factors had not yet been declared when, in *Commonwealth* v. *Gould*, 380 Mass. 672, 684-686 (1980), we

first required that the jury be instructed that they may consider the defendant's mental condition at the time of the killing in determining whether the defendant committed the killing with extreme atrocity or cruelty. We declared that "if a malicious mind may be considered as evidence that a defendant committed a murder with extreme atrocity or cruelty, then fairness requires that an impaired mind may also be considered as evidence bearing on whether or not the defendant committed the murder with extreme atrocity or cruelty." *Id.* at 684-685. See *Commonwealth* v. *Perry,* 385 Mass. 639, 649 (1982) (jury must consider evidence of defendant's intoxication when determining whether murder was committed with extreme atrocity or cruelty). We also noted that:

> "[t]he jurors' broad discretion [to determine whether the method of inflicting death is so shocking as to amount to extreme atrocity or cruelty] will more accurately reflect the community's conscience, goals, and norms, if the jurors are not arbitrarily restricted to considering only the defendant's course of action, but are also permitted to consider the defendant's peculiar mental state as an additional factor to be weighed in determining whether the murder was committed with extreme atrocity or cruelty."

*Gould, supra* at 685-686. This analysis suggests that, when *Gould* was decided, we recognized that a defendant's state of mind mattered in determining whether a killing was committed with extreme atrocity or cruelty. Our decision today suggests that it still does and still should.

If, as we conclude today, a verdict of murder in the first degree based on extreme atrocity or cruelty is not consonant with justice because of the defendant's mental disorder, perhaps we should require that a defendant's state of mind always be considered in determining whether a killing is committed with extreme atrocity or cruelty, and not limit such consideration to cases where a defendant had a mental impairment or was under the influence of alcohol or drugs. If the reason such a defendant may be less criminally culpable is based on the defendant's inability to intend to commit an extremely atrocious or cruel murder, then perhaps a defendant who does not intend to commit such an act should not be convicted of murder in the first degree on that theory. Perhaps

we should join those States that, by statute or common law, will not permit a finding that a killing was aggravated by extreme atrocity or cruelty (or comparable terms of art) unless the defendant intended that the victim suffer a torturous death or was indifferent to the victim's extreme suffering. See, e.g., N.Y. Penal Law § 125.27(1)(a)(x) (McKinney 1998) (person guilty of murder in first degree where he intends to cause death of another, causes death, and "acted in an especially cruel and wanton manner pursuant to a course of conduct *intended to* inflict and inflicting torture upon the victim prior to the victim's death" [emphasis added]); *State* v. *Gallardo*, 225 Ariz. 560, 566 (2010), cert. denied, 131 S. Ct. 1796 (2011) ("especially cruel" requires jury to find that victim "consciously suffered physical or mental pain, distress or anguish prior to death" and defendant "kn[e]w *or should have known* that the victim would suffer" [emphasis added]); *State* v. *Rizzo*, 303 Conn. 71, 133, cert. denied, 133 S. Ct. 133 (2012), quoting *State* v. *Cobb*, 251 Conn. 285, 445 (1999) (defendant may be eligible for death penalty if "[1] the defendant intended to, and in fact did, inflict extreme physical or psychological pain, suffering or torture on the victim; or [2] the defendant was callous or indifferent to the extreme physical or psychological pain, suffering or torture that his intentional conduct in fact inflicted on the victim").[1] And perhaps the *Cunneen* factors are not a fair measure to distinguish between murder in the first degree and murder in the second degree where they permit a finding of extreme atrocity or cruelty even where the defendant did not intend to commit an extremely atrocious or cruel death and was not indifferent to the victim's extraordinary or prolonged suffering.

I do not contend that these issues should have been decided in this case, where they were neither raised by the defendant nor briefed. But I do contend that this case reveals an apparent inconsistency in our common law of homicide that we should confront when the issue next arises, i.e., whether a defendant's state of mind must be considered in determining whether a murder is committed with extreme atrocity or cruelty.

---

[1]Connecticut subsequently abolished the death penalty. Conn. Gen. Stat. § 53a-46a (2013).