NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-10340


COMMONWEALTH  vs.  ROY DOWDS.



Essex.     December 7, 2018. - November 8, 2019.

Present:  Gants, C.J., Gaziano, Budd, Cypher, & Kafker, JJ.


Homicide.  Felony-Murder Rule.  Motor Vehicle, Theft.  Robbery.
    Mental Impairment.  Constitutional Law, Assistance of
    counsel, Admissions and confessions, Voluntariness of
    statement.  Evidence, Admissions and confessions,
    Voluntariness of statement.  Practice, Criminal, Capital
    case, New trial, Motion for reconsideration, Assistance of
    counsel, Admissions and confessions, Voluntariness of
    statement.



Indictment found and returned in the Superior Court
Department on June 9, 2006.

The case was tried before Richard E. Welch, III, J.; a
motion for a new trial, filed on October 6, 2014, was heard by
him; and a motion for reconsideration, filed on June 30, 2017,
was heard by Kenneth W. Salinger, J.


David J. Nathanson (Eva G. Jellison also present) for the
defendant.
Catherine Langevin Semel, Assistant District Attorney, for
the Commonwealth.


GAZIANO, J.  In May 2006, Keith Koster was killed while

attempting to prevent the defendant from stealing Koster's sport utility vehicle (SUV).  The incident was seen by a number of witnesses, and the defendant was arrested shortly after he crashed the SUV to which Koster had been clinging.  Although the defendant suffers from long-standing brain injuries that affect his cognition and behavior, trial counsel took no steps to research or present any such evidence in the defendant's motion to suppress or at trial.  A Superior Court jury found the defendant guilty of murder in the first degree on theories of extreme atrocity or cruelty and felony-murder predicated on unarmed robbery.[1]

Represented by new counsel, the defendant filed a motion for a new trial; he argued ineffective assistance due to trial counsel's failure to consult an expert about the defendant's mental capacity.  The motion was denied by the trial judge.  A different judge subsequently denied the defendant's motion to reopen and reconsider the motion for a new trial.

We discern no error in the decisions to deny the motion for a new trial and the motion to reopen and reconsider that motion. In the circumstances of the case, however, we conclude that,

---

[1] The jury did not find the defendant guilty of murder in the first degree on a theory of deliberate premeditation, but did convict him of larceny of a motor vehicle.  At sentencing, the court placed the convictions of unarmed robbery and larceny of a motor vehicle on file.

pursuant to our authority under G. L. c. 278, § 33E, the interests of justice require that the degree of guilt be reduced to murder in the second degree.

1. Background. a. Facts. We recite the facts the jury could have found, reserving some details for later discussion.

The victim, who was twenty years old, worked at a retail shop located on Route 114 in Danvers. On an evening in May 2006, the victim parked his SUV outside the shop, leaving the keys inside the vehicle. At approximately 7:30 P.M., the victim's coworker saw the defendant walking towards the area where the SUV was parked. Seeing the SUV being driven away, the shop's owner alerted the victim, who ran out to the SUV as it prepared to merge onto Route 114.

The victim banged on the front passenger's side window and yelled for the defendant to stop. The victim then clung to the SUV's exterior as it pulled out of the parking lot and accelerated down Route 114. Witnesses observed the SUV "shaking" as it swerved back and forth, changed lanes,[2] and veered from side to side. The SUV struck a telephone pole approximately one-half mile from the shop, causing the vehicle to "fl[y] up in the air," spin into two vehicles parked at a

_____

[2] Route 114 has two traffic lanes traveling east and two lanes traveling west. It is a major State highway lined with retail establishments.

nearby automobile dealership, and then collide with a light pole, where the SUV came to a stop.

A collision analyst determined that the SUV had been traveling forty-nine miles per hour when it was spinning, and at a greater speed immediately prior. During the crash, the victim struck a telephone pole, was thrown into the air, and landed in the street. He incurred a fractured skull, two contusions on his brain, numerous broken bones, a torn liver, and severe wounds to his right leg and arm.

The defendant got out of the SUV and stumbled away from the scene, passing behind a row of vehicles parked at the automobile dealership. A witness called the police, who arrived within minutes. Officers initially requested an aerial medical evacuation, then canceled it due to the victim's fatal injuries. Approximately fifteen to twenty minutes after the crash, officers apprehended the defendant in a parking lot near the scene.

The defendant, who had scratches on his arm and a small amount of blood on his neck, told the officers that he did not need medical attention. An arresting officer informed the defendant of his rights pursuant to Miranda v. Arizona, 384 U.S. 436 (1966), and the defendant indicated that he understood those rights. The defendant admitted that he stole the SUV because he wanted to drive it to his home in Lawrence. He also

acknowledged that he had left the scene after the crash. Two witnesses identified the defendant as the man they had seen leaving the SUV.[3]

Officers brought the defendant to the Danvers police station, where he again waived his Miranda rights, this time by signing a waiver form. Immediately before being questioned, the defendant was again read his Miranda rights, and signed another waiver form. When interviewed by Lieutenant Norman Zuk and Sergeant Carole Germano, the defendant stated that at approximately 11:30 A.M. that day, he had smoked "weed" and had consumed "a forty" ounce beer at an apartment in Beverly. At approximately 2 P.M., he began to walk the roughly twenty miles from Beverly to his home in Lawrence. Along the way, in Danvers, the defendant encountered the victim's SUV. The defendant said that he chose to steal that particular vehicle because he had looked inside and seen the keys. Following questioning, the defendant said that, after getting into the SUV, he saw the victim at the passenger's side window. The defendant also observed the victim jump onto "the side of the

---

[3] Prior to trial, the defendant also moved separately to suppress the witness identifications. After a hearing, the judge denied the motion. On appeal, the defendant does not challenge this denial. We nonetheless have reviewed the record pursuant to G. L. c. 278, § 33E, and discern no substantial likelihood of a miscarriage of justice as a result of the denial.

vehicle," bang his fist on the closed window, and yell at the defendant to stop. The defendant said that he had wanted to remove the victim from the SUV "through any means necessary," so that the defendant could "have whatever [he] felt . . . was right for" him. The defendant explained that he swerved around other vehicles on the road in an attempt to shake the victim from the vehicle.

The defendant mentioned that he had a history of seizures, but said that he had not experienced a seizure for approximately forty-five days. He also discussed Michelle Kitchen, a reentry case manager who had helped him to secure housing after he had completed serving a prison sentence approximately six weeks earlier.

b. Prior proceedings. The defendant was indicted on charges of murder in the first degree, G. L. c. 265, § 1; unarmed robbery, G. L. c. 265, § 19; and larceny of a motor vehicle, G. L. c. 266, § 28. He filed a motion to suppress his statements on the ground that his Miranda waivers and subsequent statements had not been voluntary. The motion was denied. Following a seven-day trial, a Superior Court jury convicted the defendant of murder in the first degree on theories of extreme atrocity or cruelty and felony-murder premised on unarmed robbery.

After the defendant's direct appeal was entered in this

court, we allowed his motion for psychiatric evaluation and remanded the case to the Superior Court. Based on evidence from a psychiatric evaluation obtained after trial, the defendant filed a motion for a new trial. The trial judge denied the motion after a two-day hearing. The defendant timely filed his notice of appeal. He later filed a motion to reopen and reconsider the motion for a new trial. A different judge denied that motion, and the defendant timely filed a notice of appeal. The defendant's direct appeal was consolidated with his appeal from the denials of his motions for a new trial and for reconsideration of that denial.

2. Discussion. The defendant's primary claim asserts ineffective assistance based on trial counsel's failure to obtain evidence of the defendant's childhood brain injuries and counsel's failure to use such evidence to challenge the defendant's mental capacity to commit murder or to waive his Miranda rights and speak with officers voluntarily. The defendant also raises a number of other issues, including improprieties in jury voir dire and errors in jury instructions. We have reviewed the instructions given and discern no substantial likelihood of a miscarriage of justice. Nor do we discern any such likelihood in the defendant's cursory claim

that the judge improperly conducted voir dire of the venire.[4]

a.  Ineffective assistance of counsel.  For claims involving ineffective assistance, our standard of review under G. L. c. 278, § 33E, is more favorable to a defendant than the constitutional standard for ineffective assistance applicable in noncapital crimes.  See Commonwealth v. Fulgiam, 477 Mass. 20, 29, cert. denied, 138 S. Ct. 330 (2017).  Contrast Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).  Thus, when reviewing ineffective assistance of counsel claims under G. L. c. 278, § 33E, we first determine "whether there was an error in the course of the trial . . . and, if there was, whether that error was likely to have influenced the jury's conclusion," Commonwealth v. Wright, 411 Mass. 678, 682 (1992), S.C., 469 Mass. 447 (2014), such that it created a "substantial likelihood of a miscarriage of justice" (citation omitted).[5]  Fulgiam,

---

[4] Because of the result we reach, the defendant's assertion concerning the disproportionality of his punishment for felony-murder is moot.  For the same reason, we do not reach the defendant's claim regarding the elements of extreme atrocity or cruelty.

[5] A motion judge in a capital case who reviews a claim of ineffective assistance of counsel must conduct "a discerning examination and appraisal of the specific circumstances of the given case" to determine whether counsel fell "measurably below that which might be expected from an ordinary fallible lawyer" and, "if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence."  See Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).  As stated, on appeal to this court, we review the defendant's claim under G. L. c. 278, § 33E, which provides a

supra.

i. <u>Motion for a new trial</u>. Represented by new counsel posttrial, the defendant acquired medical records demonstrating that he long has suffered from frontal brain injuries that impair his cognition and behavior. The defendant also obtained an expert witness, Dr. Montgomery C. Brower, who interviewed the defendant and conducted a forensic evaluation of the defendant's medical, educational, and criminal records. Based on these materials, Brower opined that, at the time of the offense, the defendant lacked the mental capacity to commit murder, or waive Miranda rights and speak with officers voluntarily, due to the defendant's intoxication, depression, and brain injuries. Accordingly, the defendant filed a motion for a new trial. After a two-day hearing, the trial judge denied the motion.

The defendant contends that trial counsel was aware of his seizure disorder and unreasonably failed to obtain and review his medical records. Had those records been obtained, the defendant argues, counsel would have learned of the defendant's

---

standard of review more favorable to the defendant. We consider "whether there was an error in the course of the trial (by defense counsel, the prosecutor, or the judge) and, if there was, whether that error was likely to have influenced the jury's conclusion." See <u>Commonwealth</u> v. <u>Wright</u>, 411 Mass. 678, 682 (1992), <u>S.C.</u>, 469 Mass. 447 (2014). The defendant requests that motion judges in capital cases be required to apply the standard of <u>Wright</u>, <u>supra</u>, rather than that of <u>Saferian</u>, <u>supra</u>. We decline to adopt this request.

long-standing brain injuries, and would have been able to consult an expert concerning the defendant's capacity to act with conscious disregard for human life, as well as his capacity to waive his Miranda rights and to speak with police voluntarily.

We review the consolidated appeal of the defendant's conviction and the denial of his motion for a new trial under G. L. c. 278, § 33E.  Commonwealth v. Moore, 480 Mass. 799, 805 (2018), citing Commonwealth v. Alicea, 464 Mass. 837, 840, (2013).  Pursuant to Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001), a judge may grant a new trial "if it appears that justice may not have been done."  In reviewing the denial of a motion for a new trial, we "examine the motion judge's conclusions only to determine whether there has been a significant error of law or other abuses of discretion" (citation omitted).  Commonwealth v. Ferreira, 481 Mass. 641, 648 (2019).  See L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014).

Findings of fact made by a judge after an evidentiary hearing on a motion for a new trial "will be accepted if supported by the record."  Commonwealth v. Walker, 443 Mass. 213, 224 (2005).  The judge is the "final arbiter" on "questions of credibility."  Id.  Where, as here, the motion judge was also the trial judge, "we give 'special deference' to the judge's

findings of fact and the ultimate decision on the motion" (citation omitted). Commonwealth v. Kolenovic, 471 Mass. 664, 672-673 (2015), S.C., 478 Mass. 189 (2017). If a motion for a new trial is premised on a claim of ineffective assistance of counsel, "the burden of proving ineffectiveness rests with the defendant" (citation omitted). Id. at 673.

Although the defendant did not specifically inform his attorney about his brain injuries, trial counsel was aware that the defendant suffered from seizures. We agree with the motion judge that "a history of seizures alone might alert defense counsel" to the fact that medical records "would be worth examining." We agree also that, had trial counsel subpoenaed the defendant's medical records, counsel "rather easily" could have discovered that the defendant suffered from long-term brain injuries first sustained when he was a young child.

Armed with the defendant's medical records, counsel readily could have obtained the services of a forensic psychiatrist to assist the defense. Therefore, we conclude that trial counsel erred in failing to consult with an expert regarding the defendant's brain injuries. See Commonwealth v. Field, 477 Mass. 553, 557 (2017) (failure to consult expert constitutes error when facts known to counsel raise "reasonable doubt" as to defendant's mental condition).

Accordingly, the question is whether counsel's error likely

influenced the jury's verdict.  See Wright, 411 Mass. at 682.

A.  Capacity to commit murder.  At the time of the defendant's trial, a conviction of felony-murder required proof of three elements:  first, that the defendant committed or attempted to commit a felony with a maximum sentence of life imprisonment; second, that the killing occurred during the commission or attempted commission of that felony; and, third, that the felony was inherently dangerous, or that the defendant acted with conscious disregard of human life.  See Model Jury Instructions on Homicide 15-16 (1999).[6]  In his final charge, the judge properly instructed the jury on the elements of felony-murder.  As to the third element, the judge instructed only on conscious disregard of human life, and the jury convicted the defendant on that basis.

In the context of the defendant's motion for a new trial, Brower opined that, at the time of the offense, the defendant had been incapable of consciously disregarding the risk to human life due to intoxication, depression, and "traumatic brain injury," which resulted in "impulsivity, lack of insight, failure to anticipate the consequences, and other impairments"

---

[6] In a case tried today, the requirements to establish felony-murder differ and require proof of malice.  See Commonwealth v. Brown, 477 Mass. 805, 807 (2017), cert. denied, 139 S. Ct. 54 (2018) (prospective convictions of felony-murder require proof of malice); Model Jury Instructions on Homicide 59-60 (2018).

that made him "essentially unable to reason through or anticipate or weigh the consequences of his actions at the time." The motion judge found portions of Brower's testimony, namely his discussion of the defendant's brain injuries, "credible" and "convincing," and "assume[d] that a jury would also." The judge found other portions of Brower's testimony -- the degree of the defendant's intoxication, depression, and cognitive ability -- "without support," based on "faulty information," and "undermined" by a "lack of balanced evaluation." The judge ultimately concluded that Brower's opinion would not have altered the jury's verdict with respect to the conviction of felony-murder.

Although the judge did not decide whether Brower's testimony would have had an effect on the jury's verdict with respect to the theory of extreme atrocity or cruelty, when, as here, a conviction of murder in the first degree is based on more than one theory, "the verdict remains even if only one theory is sustained on appeal." Field, 477 Mass. at 558.

As to Brower's opinion concerning the defendant's asserted intoxication, the judge found that the facts at trial demonstrated that the defendant was not inebriated at the time of the crash. The defendant had smoked marijuana and consumed forty ounces of beer at approximately 11:30 A.M. that day. He did not "black out." Rather, at approximately 2 P.M., the

defendant left his cousin's apartment and began walking from Beverly to Lawrence. At approximately 7:30 P.M., the defendant stole the victim's SUV. The judge thus determined that the crash occurred approximately eight hours after the defendant last had consumed marijuana and beer, and that the defendant had not been intoxicated at that point. While one officer noted that, when he was arrested, the defendant "exuded a slight odor" of alcohol and his eyes were "glassy," the judge's finding that the defendant was not intoxicated is not inconsistent with the record. See Commonwealth v. Candelario, 446 Mass. 847, 855 (2006); Walker, 443 Mass. at 226-227.

In addition, because Brower's opinion concerning the defendant's depression was premised primarily on observations that Brower made during his interview of the defendant nearly six years after the offense, and while the defendant was serving a life sentence, the judge concluded that Brower's opinion shed little light on the defendant's state of mind at the time of the offense.[7] See Commonwealth v. Foster, 471 Mass. 236, 245-246 (2015) ("the defendant's mental state in response to his

---

[7] Although the defendant's educational and medical records indicate that he experienced depression and physical and mental traumas in his childhood, and attempted suicide multiple times, the records also suggest that the defendant's depression might have abated as an adult. The medical record most contemporaneous to the events at issue, from the Department of Corrections, indicates that the defendant did not require mental health services at that point.

incarceration does not bear on his mental state at the time of the killing").  Moreover, at the hearing on the motion for a new trial, Brower agreed that, to the extent that the defendant had been depressed on the day of the offense, any depression did not meaningfully contribute to his state of mind at that time.  We conclude that the judge's finding as to the defendant's depression is not inconsistent with the record.  See Walker, 443 Mass. at 224.

The more difficult question is whether Brower's opinion with respect to the defendant's brain injuries was likely to have influenced the jury's verdict.  In 1978, when the defendant was four years old, a motor vehicle hit him, fracturing his skull and leg, causing brain damage, and requiring him to be hospitalized for at least six weeks.  After the accident, the defendant engaged in impulsive and self-harmful behaviors, including setting fire to his own bed; swallowing shoe polish, furniture polish, and fingernail polish; and eating paint.  He also was reported to have experienced lead poisoning.  He had an individual education plan and received special services in school; he demonstrated repeated difficulties with impulse control.

In 1987, when the defendant was a young teenager, he again was struck by a vehicle, this time while riding his bicycle. The accident left the defendant unconscious for two days and

caused him to suffer additional brain damage. An electroencephalogram conducted in 1988 demonstrated abnormal rhythmic spikes and slow wave activity over the right frontal polar region of the defendant's brain. This abnormal brain activity was observed both while the defendant was awake and asleep. The patterns were determined to represent focal pathology. Moreover, computerized tomography scans conducted in 1987 and 1991 showed areas of low density in the right frontal and left front parietal cerebral regions of the brain, representing an "old injury" with "atrophy." Although further clinical examination was recommended, it does not appear that any was completed.

After the 1987 accident, the defendant "exhibited noticeable changes in behavior," began to experience seizures, and struggled to control his impulses and his conduct. He was diagnosed with a seizure disorder, and he presented with antisocial qualities, learning disabilities, and poor judgment. He also evinced impatient behaviors, such as "want[ing] things or results right away." In addition, the defendant stole from his foster family, was consistently disruptive at school, urinated on the floor, and urinated in a vase before pouring the urine onto the floor at a "Dare Mentor home." In 1990, the defendant was "functioning in the 'Borderline' range of intelligence," or "at about the 5th percentile overall," with

some areas "below the 1st percentile" and other areas in the "low average" range.

The defendant continued to experience seizures into adulthood, was easily aggravated, and struggled to control his temper. As an adult, the defendant remained typically "slow to respond" to questions, needed "time to retrieve detailed information," and generally provided laconic verbal answers. Although, as an adult, the defendant generally tested academically at "low elementary school" levels, his spelling and oral word recognition abilities were at an "eighth grade level" and a "[h]igh school level," respectively. The defendant also tested at a high school level for such things as visual memory, visual reasoning, and motor functioning. The defendant presented considerable difficulty, however, with "executive functioning," testing in the "mentally handicapped range" for such things as self-monitoring, attentional control, idea generation, and problem solving. The defendant also tested in the mentally handicapped range in a number of verbal skills, such as when attempting to recall information told to him by others.

Based on the defendant's medical history, and his own observations of the defendant, Brower opined that the defendant's "impulsivity, lack of insight, failure to anticipate . . . consequences, and other impairments related to

his brain injury made him essentially unable to reason through or anticipate or weigh the consequences of his actions at the time."

We turn to the record of the defendant's mental capacity at the time of the offense, bearing in mind Brower's opinion and the defendant's medical record.  Before he stole the victim's SUV, the defendant peered into several vehicles, settling on the victim's SUV because he could see the keys inside it.  The defendant said that he knew the vehicle did not belong to him but chose to steal it anyway.  He explained that he quickly "tried to get away" with the SUV because after "get[ting] in the car that's not [his], . . . it's only natural that [he was] going to think that people [were] going to be watching" him.  He also said that Kitchen, his reentry case manager, would be upset with him when she learned that he had caused the victim's death by stealing and crashing the victim's SUV, indicating that he understood his conduct had consequences.

The defendant refused a sobriety test when he was in police custody, "figur[ing] that it wouldn't do [him] any good to take one" after he had been drinking.[8]  He realized that a condition of his probation required him to abstain from alcohol, and he

---

[8] Because trial counsel argued that the defendant was intoxicated at the time of the crash, the judge concluded that the defendant's testimony about refusing a sobriety test properly was admitted to show his state of mind.  We agree.

was concerned about the likely ramifications of taking the sobriety test after drinking beer.[9]  Brower opined that the defendant's statements demonstrated "self-preservation thinking," and showed that the defendant was aware there likely would be consequences for his actions.  Brower also testified that, when the defendant initially told the police that he did not remember stealing or driving the victim's SUV, the defendant was "not credible," and again was engaging in self-preservation thinking.  According to Brower, this demonstrated that the defendant understood that there would be consequences for what he had done, and that he was attempting to escape those consequences.

Taking into account the defendant's brain injuries and his cognitive impairments, the judge found that the defendant knew the victim was clinging to the exterior of the SUV, and that the victim had banged on the SUV window and yelled for the defendant to stop.  Aware that the victim was on the SUV, the defendant chose to accelerate down Route 114, swerving through traffic in an attempt to "shake" the victim from the vehicle.

On this record, the judge did not abuse his discretion in finding that the defendant possessed the factual knowledge and

_____

[9] The defendant explained that he was on probation as a result of a previous offense during which he attempted to steal a vehicle and nearly hit a police officer with that vehicle before stalling and crashing.

the intellectual capacity to comprehend the clear danger posed to the victim.  Accordingly, we discern no error in the judge's conclusion that expert testimony would not have altered the jury verdict as to felony-murder.

B.  Voluntariness.  The defendant also argues that he received ineffective assistance based on trial counsel's failure to obtain an expert witness to challenge the voluntariness of the defendant's Miranda waivers and his subsequent statements to police.  We conclude that the judge's decision did not constitute a clear error of judgment such that it fell outside the range of reasonable alternatives.  See L.L., 470 Mass. at 185 n.27.

A defendant who suffers from a cognitive disability may waive his or her Miranda rights and provide statements to police so long as he or she does so voluntarily.  See Commonwealth v. Zagrodny, 443 Mass. 93, 99-100 (2004).  "The voluntariness of the waiver on the basis of Miranda and the voluntariness of the statements on due process grounds are separate and distinct issues but they are both determined in light of the totality of the circumstances and they share many of the same relevant factors" (citation omitted).  Commonwealth v. Woodbine, 461 Mass. 720, 729 (2012).  A defendant must voluntarily, knowingly, and intelligently waive his or her Miranda rights after being informed of those rights.  See Commonwealth v. Clark, 461 Mass.

336, 342 (2012).  A defendant's subsequent statements must be made of a rational intellect and a free will.  See Woodbine, supra.

As stated, Brower opined that the defendant was unable voluntarily to waive his Miranda rights or voluntarily to speak to officers because he was intoxicated and depressed, and had long-standing brain injuries at the time of the crash.  The judge disagreed; he found it "highly unlikely" that depression rendered the defendant incapable of voluntarily waiving his Miranda rights or speaking intelligently and knowingly with officers, and discerned "no evidence of intoxication."  For the reasons discussed, we conclude that the record supports the judge's findings with regard to the absence of intoxication and depression at the time of the offense.

The judge who heard the motion for a new trial also concluded that the judge who conducted the hearing on the motion to suppress had evaluated carefully the conduct of the police during the interview.  The motion for a new trial judge determined that the defendant voluntarily waived his Miranda rights prior to speaking with officers,[10] and that the

_____

[10] The defendant argues that one of the interviewing officers trivialized the significance of the defendant's Miranda rights by treating them as a nuisance to be rushed through.  As with the prior administrations of Miranda warnings, the motion judge found that this administration was legally sufficient. The audio-visual recording supports this finding; it reveals

defendant's subsequent statements had been made of a free will and a rational intellect. In his decision on the motion for a new trial, the judge noted that the defendant was "cogent" and that his responses had been "appropriate, throughout." The judge also found that the defendant's conduct during the interview suggested "careful calculation on his part." This conclusion is consistent with Brower's testimony that the defendant intentionally modified his statements to avoid harmful personal consequences, and knowingly lied to police in an attempt to avoid the repercussions of his conduct.

As noted, the record indicates that the defendant often is slow to comprehend and respond to questions. Brower testified, however, that when provided sufficient time to think, the defendant is capable of reasoning and considering the consequences of his actions. We have reviewed an audio-visual recording of the interview,[11] which demonstrates that the

---

that the officer recited the Miranda rights in a clear voice, provided the defendant with a written copy of those rights, allowed the defendant ample time to consider and sign the waiver form, and verbally verified that the defendant understood the rights and wished to speak with officers.

The defendant asserts also that his verbal waiver was equivocal. Even assuming this statement is accurate, the defendant unambiguously agreed to speak with the officers only moments thereafter, and again agreed to speak with police later during the interview.

[11] The defendant consented to the recording of the interview.

officers spoke calmly and slowly when asking the defendant questions. They did not rush the defendant to answer those questions, and allowed adequate time for him to consider the questions and proffer his responses.

In addition, the defendant maintains that, during the interview, the officers used tactics that overpowered his will, and that his statements to Brower nearly six years later indicate that the defendant apathetically had "abandon[ed] himself to fate" during the interview. We have reviewed the entire record and discern no appreciable basis to conclude that the police employed tactics that overpowered the defendant's will or that the defendant abandoned himself to fate.

ii. _Motion to reopen and reconsider motion for a new trial_. In June, 2006, one of the interviewing officers spoke by telephone with Kitchen, the defendant's reentry case manager, and documented the conversation with handwritten notes. Kitchen told him that the defendant had been struck by vehicles twice when he was a child. In addition, Kitchen said that she suspected the defendant suffered from a "head injury." Kitchen also told the officer, however, that the defendant was "not mentally impaired" and had "no retardation." Although the officer and Kitchen initially scheduled a time to complete a more formal interview, it was rescheduled multiple times.

On May 18, 2007, three days before trial, the officer again

interviewed Kitchen; this time, he recorded the conversation. Kitchen reiterated that the defendant twice had been struck by vehicles when he was a child. Because the defendant often was slow to respond to questions, Kitchen said that she suspected the defendant's childhood accidents had caused him to incur permanent brain injuries. Kitchen also noted that she had attempted to schedule an appointment for the defendant to be examined by a neurologist. The defendant never saw a neurologist, however, because he was arrested prior to the scheduled appointment. In any event, Kitchen told the officer that she did not believe the defendant suffered from mental impairment or "retardation," but that she feared that he suffered from a physical brain injury. She also observed that, when provided sufficient time to think, the defendant understood what others said to him.

Although the interviewing officer did not share the initial Kitchen interview with the prosecutor, he did disclose the second interview. On May 21, 2007, prior to jury empanelment, the prosecutor provided defense counsel with a compact disc containing an audio recording of that interview. Defense counsel did not listen to the recording at that point, and did not request a delay in empanelment or a continuance in order to review the recording. The recording was not presented to the jury, and Kitchen was not called as a witness.

The defendant's appellate counsel was unaware of either Kitchen interview until March 2017, when the Commonwealth provided defense counsel with the interviewing officer's handwritten notes from the first interview and an audio recording of the second interview. Based on the content of those interviews, the defendant filed a motion to reopen and to reconsider the motion for a new trial. He argued prejudice as a result of the Commonwealth's late disclosure, and ineffective assistance due to trial counsel's failure to review the recording of the second Kitchen interview. After a hearing at which Kitchen testified, a different judge denied the motion. The judge found that the second Kitchen interview had been disclosed to defense counsel prior to trial, and also that it was largely duplicative of the evidence considered by the judge who had denied the motion for a new trial. The defendant timely filed a notice of appeal.

Before us, the defendant summarily reasserts his prior arguments. The motion judge is correct that the Commonwealth "should have disclosed the first Kitchen interview long before trial," because the interview provided potentially exculpatory information that the Commonwealth was constitutionally required to disclose. We also agree with the judge, however, that, by disclosing the second Kitchen interview, the Commonwealth shared "all of the information that [the officer] had learned the first

time he spoke with Kitchen." Noting that delay alone does not necessarily constitute prejudice, see Commonwealth v. Molina, 454 Mass. 232, 236 (2009), the judge rejected the defendant's argument on that ground. We discern no error in the judge's ruling.

Moreover, as stated, trial counsel was provided with a recording of the second interview prior to jury empanelment, but chose not to seek a continuance of trial or a delay of empanelment. Those decisions are not fairly attributable to the Commonwealth. In these circumstances, the last-minute disclosure of the second Kitchen interview, although improper, did not itself create a substantial likelihood of a miscarriage of justice. Accordingly, there was no error in the decision to deny the motion to reopen and reconsider the motion for a new trial.

b. Review under G. L. c. 278, § 33E. The scope of our review under G. L. c. 278, § 33E, is broader than the scope of review employed by a trial or motion judge, because we may consider the entirety of the appellate record, including evidence that was not before any one judge. Kolenovic, 478 Mass. at 209-210. Our duty is not to sit as "a second jury" but, rather, to consider "whether the verdict returned is consonant with justice" (citation omitted). Commonwealth v. Berry, 466 Mass. 763, 770 (2014). After such consideration, we

"may, if satisfied that the verdict was against the law or the weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require (a) order a new trial or (b) direct the entry of a verdict of a lesser degree of guilt." G. L. c. 278, § 33E. See, e.g., Commonwealth v. Vargas, 475 Mass. 338, 364 (2016).

Here, the jury concluded that the defendant was culpable of having committed murder, and we do not upset the jury's finding on that issue. In the circumstances of this case, "there is no question of reducing the verdict below murder" (citation omitted). See Berry, 466 Mass. at 772. Rather, the "less drastic" question presented is whether there is ground to reduce the verdict from murder in the first degree to murder in the second degree (citation omitted). Id. We conclude that there is.

As stated, the defendant sustained two serious brain injuries as a child, which produced long-term brain damage. The injuries caused abnormal brain functioning that inhibits the defendant's ability to control his impulses. The defendant's traumatic brain injuries prevented him from restraining his impulses such that, at the time of the offense, his conduct was driven by his incapacity for self-monitoring or self-control. These uncommon facts were not presented to the jury. In such unique circumstances, a verdict of murder in the second degree

is more consonant with justice than is a verdict of murder in the first degree. See Commonwealth v. Colleran, 452 Mass. 417, 434 (2008) ("We are left with the clear sense that this defendant's conduct, although culpable, was very much driven by [his] mental condition"). See, e.g., Berry, 466 Mass. at 772-774. Compare Commonwealth v. Whitaker, 460 Mass. 409, 421 (2011) (declining to reduce verdict where "defendant's psychological diagnosis, while significant, does not reach [a sufficient] level of severity, and there is no evidence that it was intertwined with the victim's killing").

3. Conclusion. The judgment of guilt of murder in the first degree is vacated and set aside. The matter is remanded to the Superior Court for entry of a verdict of guilty of murder in the second degree, and for resentencing.

So ordered.